IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

AARON HOPE,
      Petitioner,

vs.                                        Case No.:  1:18cv144/AW/EMT

DEPARTMENT OF CORRECTIONS,
      Respondent.
_____/

## **REPORT AND RECOMMENDATION**

Petitioner Aaron Hope ("Hope") has filed a counseled amended habeas petition under 28 U.S.C. § 2254 (ECF No. 5).  Respondent ("the State") filed an answer and relevant portions of the state court record (ECF No. 17).  Hope filed a reply (ECF No. 35).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of the issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, *see* Rule 8(a), Rules Governing Section 2254 Cases.  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Hope is not entitled to federal habeas relief.

## I.    BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 17).[1]  Hope was charged in the Circuit Court in and for Levy County, Florida, Case No. 2009-CF-280, with one count of attempted first degree murder (Count I), one count of aggravated battery with a deadly weapon (Count II), and three counts of aggravated assault with a deadly weapon (Count III, IV, and V) (Ex. A at 17–18).  Following a jury trial on March 25–26, 2010, the jury found Hope guilty as charged on all counts, with additional specific factual findings (Ex. A at 67–69, Exs. B, C, D, E).[2]  At the conclusion of trial, the court sentenced Hope to a term of life imprisonment with a mandatory minimum term of twenty-five (25) years on Count I, pursuant to Florida Statutes § 775.087 (Ex. A at 72–85; Ex. E at 528–47).    The court sentenced Hope to a

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with the State's answer (ECF No. 17).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

[2] With respect to Count I, the jury found that Hope actually possessed and discharged a firearm, and as a result of the discharge of the firearm, Hope caused great bodily harm to Cosmo James (Ex. A at 67).  With respect to Count II, the jury found that Hope actually possessed and discharged a firearm, and as a result of the discharge of the firearm, Hope caused great bodily harm to Cosmo James (*id.* at 68).  With respect to Count III, the jury found that Hope actually possessed and discharged a firearm (against Anna Diefendorf) (*id.*).  With respect to Count IV, the jury found that Hope actually possessed and discharged a firearm (against Curtis Daniels) (*id.* at 69).  With respect to Count V, the jury found that Hope actually possessed and discharged a firearm (against Jessica Mylam) (*id.*).

mandatory term of twenty-five (25) years in prison on Count II, and mandatory minimum terms of twenty (20) years in prison on each of Counts III, IV, and V, pursuant to § 775.087, with the sentences on all Counts to run concurrently (*id.*).

Hope, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D10-1867 (Exs. H, I, J). The First DCA issued the following opinion on April 23, 2011:

> We affirm the first two issues raised by Appellant without comment, and based on the State's concession of error on the third issue, we remand for resentencing to reflect the dismissal of the aggravated battery charge.

(Ex. K). *Hope v. State*, 68 So. 3d 366 (Fla. 1st DCA 2011) (Mem). The mandate issued September 20, 2011 (Ex. K).

The trial court appointed counsel to represent Hope on resentencing (Ex. L at 132–33, 136). The State dismissed Count II (the aggravated battery charge), and at a resentencing hearing on September 22, 2011, the trial court re-sentenced Hope to the same sentences on Counts I, III, IV, and V (Ex. S at 1–13). A new judgment and sentence rendered the same day (Ex. GG at 18–29). Hope, through counsel, appealed the new judgment to the First DCA, Case No. 1D11-5430 (Ex. T). Hope's counsel filed a brief, pursuant to *Anders v. California*, 386 U.S. 738 (1967), asserting that there were no meritorious arguments to support the contention that reversible error

occurred in the trial court (Ex. T).  Hope filed a pro se initial brief  (Ex. U).  Hope's

counsel then filed a supplemental initial brief (Ex. V).  On January 31, 2013, the

First DCA affirmed the re-sentencing judgment (Ex. Y).  *Hope v. State*, 134 So. 3d

1044 (Fla. 1st DCA 2013).  The mandate issued February 26, 2013 (*id.*).

On February 28, 2013, Hope filed a motion to correct illegal sentence in the

state circuit court, pursuant to Rule 3.800(a) of the Florida Rules of Criminal

Procedure (Ex. GG at 1–5).  Hope claimed that his life sentence with a 25-year

mandatory minimum on Count I was illegal, because the charging document did not

allege that his discharge of a firearm cause great bodily harm, under Florida Statutes

§ 775.087(2)3. (*see id.*).  Hope also challenged his 20-year mandatory minimum

sentences on Counts III, IV, and V, on the ground that the charging document did

not allege he discharged a firearm during commission of those offenses, as required

under § 775.087(2)2. (*see id.*).  On April 9, 2013, the circuit court granted Hope's

motion and directed the clerk of court to amend Hope's sentence as follows:

> II.    The Clerk of Court shall amend the sentence on Count I
> (Attempted First-Degree Murder) of the above-captioned case,
> *nunc pro tunc* September 22, 2011, by amending the mandatory
> minimum portion of the sentence to 20 years pursuant to section
> 775.087(2)a.2., Florida Statutes.  The sentence shall remain the
> same in all other respects.
>
> III.   The Clerk of Court shall amend the sentence on Counts III, IV,
> and V (Aggravated Assault with a Deadly Weapon) of the above-

> captioned case, *nunc pro tunc* September 22, 2011, by amending
> the imposed sentence to 3 years imprisonment in the Department
> of Corrections with a mandatory minimum of 3 years pursuant to
> section 775.087(2)a.1., Florida Statutes.   The sentence shall
> remain the same in all other respects.

(Ex. GG at 6–9).  Hope did not appeal the decision.  An amended judgment and

sentence rendered on May 20, 2013 (*id.* at 78–86).

On April 18, 2013, Hope filed a motion for post-conviction relief in the state

circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex.

GG at 33–71).  The state circuit court summarily denied the Rule 3.850 motion on

February 7, 2014 (Ex. HH at 186–201).  Hope appealed the decision to the First

DCA, Case No. 1D14-1430 (Ex. II).  The First DCA reversed the circuit court's

decision as to one claim (which is not presented in Hope's amended § 2254 petition)

and remanded for an evidentiary hearing on that claim, but the court affirmed the

circuit court's adjudication of the remaining claims (Ex. PP).  *Hope v. State*, 148 So.

3d 130 (Fla. 1st DCA 2014).  The mandate issued October 27, 2014 (*id.*).

On February 13, 2015, Hope filed a second motion to correct illegal sentence

in the state circuit court, pursuant to Rule 3.800(a) of the Florida Rules of Criminal

Procedure (Ex. YY at 1–3).  The court summarily denied the motion on March 2,

2015 (*id.* at 4–6).  Hope appealed the decision to the First DCA, Case No. 1D15-

1752 (Ex. ZZ).  The First DCA affirmed per curiam without written opinion on

November 4, 2015 (Ex. CCC). *Hope v. State*, 181 So. 3d 487 (Fla. 1st DCA 2015) (Table). The mandate issued January 5, 2016 (Ex. EEE).

On February 25, 2015, Hope filed a second Rule 3.850 motion in the state circuit court and then supplemented the motion with an additional claim (Ex. FFF at 10–32). The circuit court summarily denied the second Rule 3.850 motion on May 25, 2016 (*id.* at 37–45). Hope appealed the decision to the First DCA, Case No. 1D16-2741 (Ex. GGG). The First DCA affirmed per curiam without written opinion on May 22, 2017 (Ex. III). *Hope v. State*, 226 So. 3d 817 (Fla. 1st DCA 2017) (Table). The mandate issued July 17, 2017 (Ex. KKK).

On March 29, 2016, Hope filed a third Rule 3.850 motion in the state circuit court and then supplemented the motion with an additional claim (Ex. LLL at 10–37). The circuit court summarily denied the third Rule 3.850 motion on May 26, 2016 (*id.* at 38–43). Hope appealed the decision to the First DCA, Case No. 1D16-2743 (Ex. MMM). The First DCA affirmed per curiam without written opinion on November 3, 2016 (Ex. PPP). *Hope v. State*, 205 So. 3d 593 (Fla. 1st DCA 2016) (Table). The mandate issued December 22, 2016 (Ex. RRR).

On December 12, 2016, Hope filed a third Rule 3.800(a) motion in the circuit court and then supplemented the motion (Ex. SSS at 1–40). The circuit court summarily denied the second Rule 3.800(a) motion on April 4, 2017 (*id.* at 49–74).

Hope appealed the decision to the First DCA, Case No. 1D17-1680 (Ex. TTT).  The

First DCA affirmed per curiam without written opinion on July 18, 2017 (Ex. VVV).

*Hope v. State*, 228 So. 3d 555 (Fla. 1st DCA 2017) (Table).  The mandate issued

August 15, 2017 (*id.*).

On March 29, 2016, Hope filed a fourth Rule 3.850 motion in the state circuit

court and then supplemented the motion with an additional claim (Ex. WWW at 12–

26).  The circuit court summarily denied the fourth Rule 3.850 motion on May 2,

2017 (*id.* at 27–29).  Hope appealed the decision to the First DCA, Case No. 1D17-

1907 (Ex. XXX).  The First DCA affirmed per curiam without written opinion on

September 15, 2017 (Ex. ZZZ).  *Hope v. State*, 234 So. 3d 657 (Fla. 1st DCA 2017)

(Table).  The mandate issued November 13, 2017 (Ex. BBBB).

Hope, through counsel, commenced this federal habeas case on July 30, 2018

(ECF No. 1).  Hope filed an amended § 2254 petition on September 6, 2018 (ECF

No. 5).

## II.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody

pursuant to 28 U.S.C. § 2254.  Section 2254(d) provides, in relevant part:

> **(d)**   An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court shall not be

granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> **(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> **(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme

Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue. *Thaler v. Haynes*, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); *Woods v. Donald*, 575 U.S. 312, 316, 135 S. Ct. 1372, 191 L. Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely because the state court fails to cite to that precedent. Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *See Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002). Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. *See Woods*, 575 U.S. at 317 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants:

"Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)).  If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim.  *See Panetti v. Quarterman*, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. *Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam).  In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong.  Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."  *Harrington*, *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

*Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on an unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." *Brumfield v. Cain*, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1).

The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*; *see, e.g.*, *Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").

Only if the federal habeas court finds that the petitioner satisfied § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claim. *See Panetti*, 551 U.S. at 954. Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

Within this framework, the court will review Hope's claims.

III.    HOPE'S CLAIMS

A.    Ground One:  "Petitioner was denied his Sixth Amendment right under the U.S. Constitution to effective assistance of counsel due to his counsel's failure to ensure the jury understood neither the charged offenses nor the fact that Petitioner was a felon in possession of a firearm could be deemed 'unlawful activity' for purposes of determining whether he had a right to stand his ground under Florida Statute 776.013(3), where counsel's failure to request a special jury instruction to explain these points, object to the prosecutor's comments, or object to the jury instructions as to section

776.013, essentially negated Petitioner's only defense to the charge of attempted first degree murder."

Hope asserts two sub-parts in Ground One (ECF No. 5 at 20–25; ECF No. 35 at 2–18).[3]  First, Hope contends his trial counsel was ineffective for failing to object to the prosecutor's eliciting testimony that he, as a convicted felon, was not permitted to possess a firearm, and counsel's failure to object to the prosecutor's closing argument that referenced this evidence (ECF No. 5 at 20–22; ECF No. 35 at 2–12). Second, Hope contends his trial counsel was ineffective for failing to object to the standard jury instructions on self-defense, or seek a clarifying instruction, because the instructions failed to clarify that neither his act of possessing a firearm nor his conduct underlying the charged offenses barred his assertion of self-defense or required him to retreat before using force (ECF No. 5 at 22–25; ECF No. 35 at 12–18).  Hope asserts he presented these IATC claims in his second Rule 3.850 motion and his appeal to the First DCA in Case No. 1D16-2741 (ECF No. 5 at 10–11).

Hope contends as a result of Attorney Bryant's errors, the jury heard improper character evidence and evidence that negated his defense, and the jury was misled to believe that Hope could not avail himself of self-defense because he was a

---

[3] Hope divided Ground I into three subparagraphs in his amended § 2254 petition (ECF No. 5 at 20–24) but combined the second and third subparagraphs (both relating to the self-defense jury instructions) in his Reply (*see* ECF No. 35 at 12 n.2).  The court follows Hope's organization in his Reply.

convicted felon in possession of a firearm at the time of the shooting (ECF No. 5 at 22–24; ECF No. 35 at 11–12, 18). Hope contends but for counsel's errors, there is a reasonable probability the jury would not have rejected his defense of self-defense (*id.*).

The State concedes Hope exhausted both aspects of Ground I in the state courts by presenting them in his first and second Rule 3.850 motions (ECF No. 17 at 24). The State contends Hope has not demonstrated that the state court's adjudication of the claims was contrary to or an unreasonable application of clearly established federal law (*id.* at 24–30).

1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To obtain relief under *Strickland*, the petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 687–88. If the petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was "reasonable considering all the circumstances," and

reasonableness is measured "under prevailing professional norms." *Strickland*, 466 U.S. at 688. "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." *Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting *Chandler*, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001)).

If the record is not complete regarding counsel's actions, "then the courts should presume that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." *Jones*, 436 F.3d at 1293 (citing *Chandler*, 218 F.3d at 1314–15 n.15). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no

relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." *Jones*, 436 F.3d at 1293 (citing *Strickland*, 466 U.S. at 690); *Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").

The petitioner's burden of demonstrating prejudice under *Strickland* is high. *See Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, the petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). And the petitioner must show that the likelihood of a different result is substantial, not just conceivable. *Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing *Richter*, 562 U.S. at 112). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a

reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. The prejudice assessment does "not depend on the idiosyncracies [sic] of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Id.* at 695. Further, when the claimed error of counsel occurred at the guilty stage of trial (instead of on appeal), *Strickland* prejudice is gauged against the outcome of trial, not on appeal. *See Purvis v. Crosby*, 451 F.3d 734, 739 (11th Cir. 2006) (citing *Strickland*, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105. As the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland*

with unreasonableness under § 2254(d).  When § 2254(d) applies, the
question is not whether counsel's actions were reasonable.  The
question is whether there is any reasonable argument that counsel
satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

> 2.    Federal Review of State Court Decision

Hope presented his claims in Grounds II and IV of his first Rule 3.850 motion

(Ex. GG at 38–40).  In the state circuit court's written decision denying the Rule

3.850 motion, the circuit court correctly stated the deficient performance and

prejudice prongs of the *Strickland* standard as the applicable legal standard (Ex. HH

at 188–89).  The court adjudicated the claims as follows:

> As to ground (B), Defendant alleges that trial counsel was
> ineffective for failing to object to a legally inapplicable jury instruction.
> At the end of the trial, the jury was given the standard instruction on
> self-defense.  *See* Trial Transcript at 509 (lines 6–25) – 512 (lines 1–
> 12); *see also* Fla. Std. Jury Instr. (Crim.) 3.6(1).  Defendant claims that
> counsel should have instructed [sic] to this instruction being given.  "A
> defendant is entitled, upon request, to a jury instruction on any theory
> of defense the substantive evidence supports."  *Rockerman v. State*, 773
> So. 2d 602, 603 (Fla. 1st DCA 2000).  This instruction was relevant to
> Defendant's defense of self-defense.  *See* Trial Transcript at 425 (lines
> 21–25) – 426 (lines 1–3).  Because the instruction was relevant to
> Defendant's defense at trial, counsel did not err by allowing it to be
> included in the jury instructions.  *See Thompson v. State*, 759 So. 2d
> 650, 665 (Fla. 2000) (holding that the failure to object to a standard jury
> instruction that has not been invalidated by the Florida Supreme Court
> is not ineffective assistance).  Accordingly, the claim raised is without
> merit.
> . . . .

As to ground (D), Defendant alleges that trial counsel was ineffective for failing to object to improper cross-examination. According to Defendant, it was improper for the State to ask him if he was supposed to be around guns as a convicted felon. *See* Trial Transcript at 378 (lines 2–4), 434 (lines 5–7), 439 (lines 14–16). Defendant is correct. The prosecutor's question on cross-examination "And you're a convicted felon. Are you supposed to be around guns?" was improper. The case law on this issue is clear. In *Dawkins v. State*,

> The state charged Dawkins with attempted first-degree murder in the shooting of Reginald Mosley. At trial, Dawkins testified and explained that he acted in self-defense. **During cross-examination, the prosecutor asked Dawkins about his prior felony conviction. Dawkins responded that he had one felony conviction. The prosecutor then asked, "You're not supposed to have a firearm, are you, Mr. Dawkins?"** The defense objected, and the trial court overruled the objection. Out of the hearing of the jury, the defense moved for a mistrial, and the court denied the motion.
>
> **During closing argument, the prosecutor stated that Dawkins was a convicted felon. The prosecutor then went on to emphasize that, as a convicted felon, Dawkins was "[o]ne that is not supposed to have a firearm."** The trial court denied defense counsel's motion for mistrial. The jury found Dawkins guilty of the lesser-included offense of aggravated battery with a firearm. The trial court sentenced Dawkins to a minimum mandatory three years in prison, followed by twelve years' probation.

605 So. 2d 1329–30 (Fla. 2d DCA I 992) (emphasis added). The Second DCA ultimately found that this question, and subsequent argument, was not harmless error and reversed for a new trial, noting that "[t]he mere asking of the question . . . placed [Dawkins'] character in issue . . . which was especially prejudicial because of his self-defense argument." *Id.* (citing *Wilt v. State*, 410 So. 2d 924, 925 (Fla. 3d DCA

I 982)).  "The jury would be less likely to believe Dawkins was defending himself if they knew he had committed other unlawful acts." *Id.*  "In addition, the prosecutor emphasized in closing argument that, as a convicted felon, Dawkins was not allowed to have a firearm."  *Id.* In *Wilt v. State*,

> During direct examination, **Wilt admitted that he had previously been convicted of a crime.  The prosecutor cross-examined Wilt asking, "(A)s a convicted felon you are not allowed to carry a gun; are you?"**  Defense counsel objected, but the objection was overruled.  His motion for mistrial was denied.

410 So. 2d 924 (Fla. 3d DCA 1982) (emphasis added).  In analyzing the issue, the Third DCA stated

> In our view, the question introduced evidence of another crime, that is, the possession of a firearm by a convicted felon, which was not material to the issues being tried and served only to establish criminal propensity.  While the fact that a defendant has previously been convicted of a crime is relevant to his credibility, once that admission has been obtained, further questioning must be viewed as an attempt to attack character.  For nearly one hundred years, it has been the law in Florida that unless a defendant has placed his character in issue, such an attack deprives him of a fair trial and constitutes reversible error.
>
> Wilt took the stand to establish that the shooting occurred when the victim approached and threatened him with a piece of broken glass.  Wilt admitted that he had a gun on his person and that he had been convicted of a crime.  The state's attempt to undermine his character or to show a propensity to commit other offenses was irrelevant to any material fact in issue.

*Id.* at 924–25 (citations omitted).  The *Wilt* court ultimately found that the error was not harmless and reversed for a new trial.

> Here, unlike the prosecutors in *Wilt* and *Dawkins*, the State did not argue during closing that Defendant was "not allowed" to possess a firearm; or, that Defendant was "not supposed" to have a firearm. Instead, the State asked the jury whether it was reasonable for Defendant to return to a perceived threat with a firearm.  *See* Trial Transcript at 433 (lines 3–25) – 442 (lines 1–12).  At trial, the evidence showed that Defendant left a perceived threat from the victim, but then returned with a firearm to confront the victim.  *See* Trial Transcript at 35 (lines 2–25) – 71 (lines 1–22), 87 (lines 2– 25) –109 (lines 1–10), 277 (lines 17–25) – 284 (lines 1–23), 310 (lines 4–25) – 328 (line 1), 349 (lines 10–25) – 386 (lines 1–21).  Thus, even though counsel did err by failing to object to the State's improper question on cross-examination, Defendant fails to show prejudice because the evidence at trial was overwhelming that Defendant was not acting in self defense. Rather, Defendant sought out the victim of the Attempted Murder charge and shot him.  Additionally, the State did not argue in closing that Defendant should not have been in possession of the gun as a convicted felon.   Because Defendant fails to show that he was prejudiced by counsel's error, the claim raised is without merit.

(Ex. HH at 190–94).

Hope presented argument on these claims in Issue Three and Issue Six of his

initial brief on appeal of the circuit court's decision to the First DCA in Case No.

1D14-1430 (Ex. II at 24–29, 34–38).  The First DCA ordered additional briefing on

the Issue Six, which it characterized as follows:

> Issue Six on appeal (Ground Two in the motion for postconviction relief) asserts error in denying the claim that defense improperly requested, or failed to object to, an inapplicable jury instruction that tracked section 776.013(3), Fla. Stat. (2009), and

> effectively negated the defenses of self-defense and no duty to retreat because Appellant, a convicted felon in possession of a firearm, was engaging in unlawful activity at the time of the shooting.

(Ex. MM).

In the State's responsive brief, the State argued only the prejudice prong of *Strickland*, i.e., that there was no reasonable probability of a different outcome at trial even if defense counsel had requested removal or clarification of the "unlawful activity" language (i.e., "**if the defendant was not engaged in an unlawful activity and was attacked in any place where he had a right to be, he had no duty to retreat**") (Ex. NN at 3–8).

Hope filed a reply brief in which he argued that the jury was made aware, through the prosecutor's cross-examination and closing arguments, that he was a convicted felon and thus not legally allowed to be around guns (Ex. OO at 2–6). Hope argued that the language of the standard jury instructions negated his sole theory of defense; therefore, defense counsel's failure to object to this language prejudiced the defense (*id.*).

The First DCA affirmed, without discussion, the denial of appellate Issue Three (the IATC claim based upon counsel's failure to object to the State's improper question on cross-examination and improper comments during closing arguments regarding Hope's being a convicted felon and not allowed to possess firearms) (Ex.

PP).  With respect to appellate Issue Six (the IATC claim based upon counsel's failure to object to the jury instruction that tracked §776.013(3)), the First DCA ruled, "Having reviewed the response and reply relating to the 'jury instruction' claim raised in appellate Issue Six, we affirm the denial of relief on that issue." (*id.*). *Hope v. State*, 148 So. 3d 130 (Fla. 1st DCA 2014).

In Hope's second Rule 3.850 motion, filed on February 25, 2015, Hope presented several IATC claims related to the self-defense jury instructions, including (1) counsel failed to request a jury instruction which explained that "unlawful activity" did not include either the charged crimes or the crime of possession of a firearm by a convicted felon (Ground A(h) of the second Rule 3.850 motion), and (2) counsel failed to request a jury instruction which explained that Hope's being a convicted felon in possession of a firearm did not preclude him from availing himself of the defense of self-defense (Hope argued counsel could have accomplished this with a jury instruction on "necessity") (Ground A(k) of the second Rule 3.850 motion) (Ex. FFF at 21–22, 28–31, 33–36).

The state circuit court applied the *Strickland* standard in assessing Hope's IATC claims (Ex. FFF at 40).  The court adjudicated these particular IATC claims as follows:

As to Ground (A)(h), Defendant alleges that "[c]ounsel failed to seek instructions and explain to the jury that the charged offense could not be considered 'unlawful activity.'" Counsel did explain to the jury that Defendant was not engaged in unlawful activity at the time of the charged offenses. *See* Trial Transcript at 415 (lines 5–12). Furthermore, there is no indication from the record that the jury was confused by the jury instruction as given. Accordingly, the claim raised is without merit.

. . . .

As to Ground (A)(k), Defendant alleges that "[t]rial counsel provided constitutionally ineffective assistance by not requesting the appropriate jury instruction of 'necessity' explaining to the jury a convicted felon in certain circumstances may possess a firearm based on *Marrero v. State*, 516 So. 2d 1052 (Fla. 3 DCA 1987)." Defendant was neither charged with nor convicted of Possession of a Firearm by a Convicted Felon. Thus, the *Marrero* case is not relevant to Defendant's case. *Id.* Furthermore, because Defendant was not charged with Possession of a Firearm by a Convicted Felon, he would not have been entitled to a necessity defense. It is important to note that Defendant presented a self-defense defense; and, that the jury was instructed as to that defense.

This Court additionally notes that Defendant's claim related to the State's improper question on cross-examination is procedurally barred by collateral estoppel. This claim has been raised before and denied on the merits. *See* Motion for Post-Conviction Relief (filed April 19, 2013) at 11–12; Order Denying Motion for Post-Conviction Relief at 7–9. And, the denial was affirmed on appeal. *Hope v. State*, 148 So. 3d 130, 130 (Fla. 1st DCA 2014) ("As to Hope's eleven issues on appeal, we affirm without discussion the denial of the claims that gave rise to appellate Issues Two through Five and Seven through Eleven.").[1] Accordingly, the claim is procedurally barred.

[FN 1: This issue is Ground IV in Defendant's first post-conviction motion and Ground (D) in the Order denying the motion.]

(Ex. FFF at 43–44).  Hope appealed the circuit court's decision to the First DCA in

Case No. 1D16-2741 and argued these issues in his initial brief (Ex. GGG at 35–30,

44–48).   The First DCA affirmed the lower court's decision without written

explanation (Ex. III).

> a.  <u>Counsel's failure to object to the prosecutor's eliciting
> testimony that he was a convicted felon and thus not permitted to
> possess a firearm, and failure to object to the prosecutor's
> reference to this fact in closing argument</u>

The last state court to adjudicate the merits of this claim was the First DCA in

the first post-conviction appeal.[4]  The First DCA affirmed, without discussion, the

circuit court's denial of this claim (Ex. PP).  Where the relevant state court decision

on the merits does not come accompanied with the state court's reasons, the federal

court should "look through" the unexplained decision to the last related state court

decision that does provide a relevant rationale.  *See Wilson v. Sellers*, — U.S. —,

138 S. Ct. 1188, 1192, 200 L. Ed. 2d 530 (2018).  The federal court should then

presume that the unexplained decision (here, the First DCA's decision) adopted the

same reasoning.  *Id.*

---

[4] Although Hope presented this issue again in his second Rule 3.850 motion, the state court did not adjudicate the merits and instead denied the claim as procedurally barred by collateral estoppel, since it was adjudicated in the first Rule 3.850 proceeding.

The circuit court rejected this IATC claim on *Strickland's* prejudice prong, and its decision was based upon two grounds:  (1) the State did not argue in closing that Hope should not have been in possession of the gun as a convicted felon, and (2) the evidence was overwhelming that Hope was not acting in self-defense (*see* Ex. HH at 194).

The state court record establishes, by clear and convincing evidence, that the state court's first ground for denying this claim was based upon an unreasonable factual finding.  As Hope points out in his reply (*see* ECF No. 35 at 6–7), the trial transcript, relevant parts of which were attached to the circuit court's order, demonstrates that the prosecutor **did** argue in closing that Hope "didn't have any business being in possession of it [the firearm]." (Ex. HH at 400).  The prosecutor then argued, "he had no business doing what he did," and "He's a convicted felon. He's carrying a loaded firearm." (*id.* at 405).  Because the first basis for the state court's decision was based upon an unreasonable factual finding, it is not entitled to deference on federal habeas review.

This leaves the question of whether the state court's second basis for rejecting Hope's prejudice argument, i.e., that there was overwhelming evidence that Hope was not acting in self-defense, was unreasonable.  To answer this question, the court

must consider all of the evidence adduced at trial, the closing arguments, and the jury instructions.

Anna Diefendorf (the victim of the aggravated assault charged in Count III) testified that on April 25, 2009, she and her boyfriend, Cosmo James, met Kurtis Daniels (Cosmo's brother) and Kurtis' girlfriend Jessica [Mylam] in Bronson at an area behind the post office known as "the Tree" (Ex. B at 33–34). The four of them were playing cards at the Tree when Cosmo's mother, Kim Daniels, pulled up in her car and said that she and "Sylvester," meaning Hope (whose middle name is Sylvester), had a dispute over $5.00 (*id.* at 34–35). Hope and his girlfriend were with Kim Daniels, and they both jumped out of Ms. Daniels' car (*id.* at 35). Cosmo and Kurtis started arguing with Hope (*id.*). She [Ms. Diefendorf] told Cosmo to stop, but they continued arguing (*id.*). Then Cosmo and Kurtis got into her [Diefendorf's] car and followed Hope and his girlfriend, who had already left on foot (*id.*). Cosmo was driving, and he wanted to physically fight Hope (*id.* at 35–36). Ms. Diefendorf testified that during the initial verbal altercation at the Tree, she did not see anyone with a weapon (*id.* at 36–37). Diefendorf testified she saw beer bottles but did not remember if anyone was holding a beer bottle or threatening anyone with a beer bottle (*id.* at 37). At some point, Cosmo and Kurtis returned to the Tree, and then she and Cosmo left to clean her car (*id.* at 37–39). Approximately

15–20 minutes later, Ms. Diefendorf and Cosmo returned to the Tree and were about to get in the car and drive back to Gainesville, when Hope and his girlfriend pulled up in an older 4-door gold Toyota with tinted windows (*id.* at 39). Ms. Diefendorf testified Hope was driving, his girlfriend was in the passenger seat, and another male was sitting in the back seat (*id.* at 39–40). Hope circled, then came back around and "drove by real slow" (*id.* at 40). Hope had his window down, and he and Cosmo engaged in a "verbal confrontation" (*id.*). Cosmo started "walking upon on [Hope's] car," and Hope started shooting (*id.* at 40–41). Ms. Diefendorf testified Cosmo did not have anything in his hands, and she did not ever see Cosmo with a gun in his hands (*id.* at 41). Ms. Diefendorf testified she saw Hope's hand outside of the car window and "kind of" saw the gun (*id.* at 42, 51–52). She testified she heard the gunshots and saw bullet casings everywhere (*id.* at 42). Ms. Diefendorf testified she got to the ground and was in fear for her life because she thought Hope was going to shoot and kill her (*id.* at 42–43). Ms. Diefendorf testified Hope was aiming at Cosmo, but she did not see any of the bullets actually hit Cosmo (*id.* at 42). She testified she did not know that Cosmo had been shot until she got up from the ground and saw he was shot in the throat (*id.* at 42–43). Ms. Diefendorf testified she believed that the first bullet hit Cosmo, and after that Hope just kept shooting, firing a total of eleven rounds (*id.*).

Jessica Mylam (the victim of the aggravated assault charged in Count V) testified that on the day in question, she and Kurtis Daniels were at the Tree in Bronson with several other people, including Cosmo James and his girlfriend Anna (Ex. B at 58–61). Mylam testified they had been at the Tree for approximately 45 minutes when Kim Daniels arrived in her car with Hope and his girlfriend, and Kim told Kurtis and Cosmo that she and Hope were having a conflict (*id.* at 61–62). Ms. Mylam testified she briefly saw Kim and Hope arguing, and after that, Cosmo and Kurtis came to Kim's defense and began "exchanging words" with Hope (*id.* at 62–63). Ms. Mylam testified she did not see anyone with a weapon, such as a bottle or a gun (*id.* at 63). Mylam testified Hope and his girlfriend left on foot, and 3 to 5 minutes later, Cosmo and Kurtis got in the car and left (*id.* at 64). Cosmo and Kurtis returned to the Tree approximately 5 minutes later (*id.*). Cosmo and Anna left to clean her car (*id.* at 65). Mylam and Kurtis stayed at the Tree and talked to Kurtis' uncle and Mr. Veal (*id.*). When Cosmo and Anna returned, the four of them got in Anna's car to leave (*id.* at 65–66). Cosmo realized he had left one of the car mats on a bench, and as he got out of the car to get the mat, Hope pulled up in a car with his girlfriend and another male in the back seat (*id.* at 65–66). Ms. Mylam testified no one motioned for Hope to stop or called him over (*id.* at 66, 74–75). Mylam testified that Cosmo and Kurtis thought Hope had brought the other male to "come

back to fight" (*id.*).  Kurtis got out of the car and stood next to Cosmo, and she [Ms. Mylam] got out and stood next to Anna on the passenger side of the car (*id.* at 67). Hope pulled up diagonally to where they were parked and opened his car door (*id.*). Hope's window was down (*id.*).  Hope started verbally arguing with Cosmo and Kurtis (*id.* at 67–68).  Kurtis and Cosmo picked up glass beer bottles and held the bottles in their hands but did not throw them (*id.* at 68).  Neither Cosmo nor Kurtis moved towards Hope—in fact, they told Hope they were not coming to his car and that he should get out of the car if he had a problem (*id.* at 68–69).  Kurtis said, "Just forget this and let's go" (*id.* at 69).  Kurtis turned his body to walk back to get in Anna's car, and Hope starting shooting (*id.*).  My Mylam testified she saw Cosmo fall (*id.* at 70–71, 77).  Ms. Mylam testified she saw the gun pointed in her and Anna's direction, so she and Anna ducked, and the shots continued in their direction (*id.* at 70–71, 77–78).  Mylam testified when the shooting stopped, she, Anna, and Kurtis got up, and she saw blood gushing out of Cosmo's neck (*id.* at 71).

Kurtis Daniels (the victim of the aggravated assault charged in Count IV) testified that his mother, Kim Daniels, did not drop off Hope and his girlfriend at the Tree (Ex. B at 86).  Kurtis Daniels testified his mother dropped Hope off at another location and then came to the Tree (*id.*).  Mr. Daniels testified his mother summoned him to her car (*id.*).  He testified he got in the car with his mother and they drove

"down the road" for five minutes (*id.*).  Kurtis Daniels testified while they were returning to the Tree, they saw Hope and his girlfriend walking on Pine Street (*id.* at 87).  Daniels testified Hope was "flagging the car down" and saying he was going to "put hands" on Daniels' mother (*id.* at 87–88).  Kurtis Daniels testified he and his mother arrived back at the Tree, and Hope eventually arrived too (*id.* at 88).  Daniels testified Hope continued saying derogatory things to his and Cosmo's mother (*id.*).  Daniels testified he picked up some bottles off the ground, and Cosmo may have picked one up, but Daniels never saw Cosmo with a handgun (*id.* at 88–89).  Kurtis Daniels testified Hope was slamming his fists on their mother's car (*id.* at 91).  Daniels testified they were "fixing to get into a fight," but Hope and his girlfriend walked away (*id.* at 91–92).  Kurtis Daniels testified his and Cosmo's mother left the Tree (*id.* at 92–93).  Daniels testified his mother then returned and told him and Cosmo something which caused Daniels and Cosmo to leave and "go after" Hope (*id.* at 92–94).  Kurtis Daniels and Cosmo were in Anna's car, and they saw Hope and his girlfriend on foot (*id.* at 94–95).  Cosmo and Daniels got out of the car and told Hope that if he did not leave their mother alone, "we going to fight" (*id.* at 95–96).  During this encounter, which lasted five to seven minutes, Kurtis Daniels picked up another bottle and threatened Hope with it (*id.* at 96).  Cosmo did not have a bottle, a gun, or any kind of weapon (*id.*).  This encounter ended when Hope took

off running, and Daniels and Cosmo went back to the Tree (*id.*). Approximately an hour later, as Daniels, Jessica, Cosmo, and Anna were getting ready to leave the Tree, Hope came back in a car with his girlfriend and a black male who was in the back seat (*id.* at 99–100). At first, Hope pulled in and left, but then turned around and came back and parked with the driver's side facing him (Daniels) (*id.* at 100–01). The window was down, and Hope said, "So y'all want to jump me?" (*id.* at 101–02). Cosmo was standing on the driver's side of Anna's car and was closer to Hope than Daniels was (*id.* at 103–04). Both Daniels and Cosmo picked up bottles and threatened Hope saying, "if he [Hope] wasn't going to leave the situation alone," but neither threw any bottles or approached Hope's car (*id.* at 105–06). Hope opened fire and Cosmo was the first person shot (*id.* at 106–07). Daniels saw the gun—it was a gray automatic (*id.*) Daniels was in fear for his own life and started running when he heard the gunshots (*id.*). After Hope fired approximately eight shots, Hope pulled off fast (*id.* at 107–08). Daniels saw Cosmo on the ground, shot in the throat (*id.* at 108).

William Veal testified he was at the Tree when the shooting occurred (Ex. B at 133–34). Veal testified he knew Cosmo James but did not know Aaron Hope (*id.*). Veal testified he did not see the shooter, but he saw that the shooter was in a gold car (*id.* at 134). Mr. Veal testified that when the gold car pulled up to the Tree,

Kurtis Daniels got two beer bottles, walked up to the car, and told the driver to get out (*id.* at 137, 140). Veal testified Kurtis Daniels was threatening the driver with the bottles, but Daniels did not act like he was going to throw them (*id.* at 140–41). Veal testified Cosmo stood by his own car and told the driver to get out (*id.* at 138). When defense counsel asked Mr. Veal whether Cosmo looked like he was trying to fight, Mr. Veal answered, "No. He acted like there wasn't going to be no [sic] fighting." (*id.* at 138). Mr. Veal testified the driver of the gold car did not get out of the car (*id.* at 134). Mr. Veal testified he saw Cosmo fall when he was shot (*id.*). He testified he did not see anyone else get shot (*id.*). Veal testified he did not see Cosmo with a gun in his hand that day (*id.* at 136).

Deputy Charles "Chuck" Johnson testified he received a dispatch to the Tree on April 25, 2009, and it took him 15–20 seconds to arrive at the scene (Ex. B at 142–43). Deputy Johnson testified he saw a young, black male sitting up with three or four people around him (*id.* at 143). Johnson testified the young man had a gunshot wound to his neck (*id.* at 143–44). Deputy Johnson testified he did not see anyone, including the victim, with a firearm (*id.* at 144–45). Johnson testified he observed five or six shell casings (*id.* at 145).

Investigator Danette Griffeth testified she recovered seven shell casings and two projectiles/bullets from the scene of the shooting (Ex. B at 150–56). Investigator

Griffeth testified one of the bullets was at the back of Anna Diefendorf's car and the other bullet was underneath the car in front of the driver's side rear tire (*id.* at 153–54). Investigator Griffeth testified she then went to Shands Hospital and photographed the victim, Cosmo James (*id.* at 157–59). The photographs were admitted into evidence (*id.*).

Investigator Gary Brewer testified he went to Shands Hospital and collected some of the victim's clothing (Ex. C at 168–79).

Investigator Mark Morgan testified he interviewed Anna Diefendorf and Jessica Mylam at the scene of the shooting (Ex. C at 181–83). Investigator Morgan testified both witnesses identified Hope as the person who shot Cosmo Jones (*id.* at 183). Morgan testified the witnesses also told him that Hope was driving a brown, tan, or gold small compact car (*id.* at 184). Investigator Morgan testified Kurtis Daniels was not at the scene when Morgan arrived (Morgan was told that Daniels accompanied Cosmo to the location of the helicopter which was transporting him to Shands Hospital), but Daniels returned to the scene while Investigator Morgan was still there (*id.* at 185). Investigator Morgan testified Daniels also identified Hope as the shooter (*id.*).

Investigator Morgan testified five days after the shooting, Hope contacted him by telephone and agreed to come to the parking lot of the Sheriff's Office (Ex. C at

186).  Morgan testified Hope arrived at the Sheriff's Office and admitted to Morgan he had consumed one beer on his way to the meeting to "relax his nerves" (*id.* at 189).  Investigator Morgan testified he advised Hope of his *Miranda* rights, and Hope agreed to a recorded interview (*id.* at 187).  Investigator Morgan testified Hope stated he was involved in three "altercations" with Kurtis Daniels and Cosmo James prior to the shooting incident (*id.*).  Morgan testified he later confirmed this information (*id.* at 192).  With respect to the shooting, Hope told Morgan his girlfriend, who was sitting beside him in the car, was the shooter (*id.* at 187–88).  Investigator Morgan testified that later that day, Hope requested to talk to him (Morgan) again (*id.* at 190).  Morgan testified that during this second interview, Hope stated he did not feel well and then broke out in a sweat and fell to the floor (*id.*).  Morgan asked Hope if he had taken any medication, and Hope stated no (*id.* at 191).  Morgan testified he called emergency medical services to evaluate Hope, but medical personnel stated they could not find anything wrong with Hope (*id.* at 191, 195).  Hope was not taken anywhere for medical treatment (*id.* at 195).  Investigator Morgan testified the first two interviews lasted a total of two hours (*id.* at 194).  The audio recording of these interviews was admitted as evidence (*id.* at 201–02).

Investigator Morgan testified he spoke with Hope a third time, and Hope told him that his first statement was "no good" because he was intoxicated (Ex. C at 190–91).  Morgan testified he was sitting approximately three feet from Hope during the first and second interviews and did not smell any alcohol or observe any physical signs of impairment (*id.* at 194).  Investigator Morgan testified he interviewed Cosmo Jones at the hospital, and Cosmo identified Hope as the person who shot him (*id.* at 200).

The defense called Shaun Greenlee as a witness (Ex. C at 235).  Mr. Greenlee testified he knew Hope, Cosmo James, and Kurtis Daniels (*id.* at 236).  Greenlee testified that on April 25, 2009, he was at his mother's house on Boundary Street, when he heard three men arguing (*id.*).  Mr. Greenlee testified he went outside and saw Hope, Cosmo James, and Kurtis Daniels (*id.*).  Greenlee testified Daniels was holding two bottles (*id.* at 237).  Mr. Greenlee testified his sister told Daniels, "Don't throw that bottle toward my car" and Daniels responded, "I'm not, ma'am" (*id.*).  Greenlee testified Hope was holding a CD player, but did not have a bottle, gun, or any other weapon (*id.*).  Greenlee testified he did not see Cosmo James with a firearm (*id.*).  Mr. Greenlee testified the men argued a little more, and then went separate ways (*id.*).

The defense next called David W. Lewis, III, as a witness (Ex. C at 238). Lewis testified he was currently an inmate of the New River Correctional Institution (*id.*). Mr. Lewis testified he knew Hope, Cosmo James, and Kurtis Daniels (*id.* at 240). Lewis testified he saw the three men at the Tree prior to the shooting, but he was not there when the shots were fired (*id.* at 239–40). Lewis testified when he saw the men at the Tree, they were arguing (*id.* at 241). Mr. Lewis testified he saw Cosmo James retrieve a black gun from the trunk of his girlfriend's car, place it in the waistband of his pants, and cover it with his shirt (*id.* at 241–42, 247). Lewis testified Hope was "just walking by" when James retrieved the gun (*id.* at 242). Mr. Lewis testified he did not see Hope or Daniels with any weapons, and he did not see Daniels pick up any bottles (*id.* at 241). Lewis testified he got in his car and left when he saw Cosmo get the gun (*id.* at 243).

The defense called Dennis Neal as a witness (Ex. C at 276). Mr. Neal testified he knew Cosmo James and Kurtis Daniels, and was related by marriage to both of them (*id.* at 276–77). Neal testified he had known Hope for five or six years, because he did yard work for Hope's mother (*id.* at 277). Mr. Neal testified he saw the three men "a couple of times" at the Tree on April 25, 2009 (*id.* at 277–78). Neal testified the first time, Hope and his girlfriend walked up while Neal and his wife were sitting under the tree "chilling" (*id.* at 278). Mr. Neal testified neither Cosmo James nor

Kurtis Daniels was there when Hope walked up (*id.*).  Neal testified Kurtis Daniels walked up later (*id.*).  Mr. Neal testified he was present when Hope was arguing with Cosmo and Cosmo's mother (Kim Daniels) (*id.*).  Mr. Neal testified he did not see either Hope or Kurtis Daniels holding a weapon (*id.* at 279).  Neal testified he saw Cosmo go to the trunk of his car, get a black gun, tuck it into the waistband of his pants, and cover it with his shirt (*id.* at 279–80, 284, 286).  Mr. Neal testified Cosmo did not point the gun at Hope (*id.* at 280).  Neal testified he heard Hope say, "You going to shoot me about $5, man" (*id.* at 281, 286–87).  Mr. Neal testified he saw Kurtis Daniels "picking up quart bottles at one time," but Kurtis did not have a weapon (*id.* at 285–86).  Neal testified Hope and his girlfriend left on foot and walked down Pine Street (*id.* at 281, 287).  Mr. Neal testified Cosmo left in a car, and then returned to the Tree 10–20 minutes later (*id.* at 282, 287).

Mr. Neal testified he was at the Tree when the shooting occurred (Ex. C at 282–83).  Neal testified Hope drove up near the store, made a circle, and was driving back past the Tree slowly (*id.* at 283).  Neal testified Cosmo and Kurtis Daniels said "all kind of bad words" to Hope (*id.* at 283–84).  Neal testified he did not see anyone with a gun (*id.* at 284).  Neal testified he did not see the shooting because he was behind a tree, but he heard two or three shots (*id.* at 282–84).

On cross-examination, Mr. Neal admitted he drank two 12-ounce beers on the day of the shooting (Ex. C at 294). He testified he did not feel impaired by the alcohol (*id.* at 294–95). Mr. Neal also admitted he had previously been convicted of two or three felonies (*id.* at 295). Neal testified he did not see Cosmo with a gun when Hope came back to the Tree in his car (*id.* at 295).

On re-direct, Mr. Neal admitted that during a pre-trial deposition he stated that when Hope pulled up to the Tree in his car, Cosmo James went back to the trunk of his car and "pulled his piece right here again" (Ex. C at 297–300). Neal admitted that his memory was better at the time of his deposition than at the time of trial (*id.* at 300–01).

Demetria Duncan testified she was Hope's fiancée (Ex. D at 305). She testified that on April 25, 2009, she and Hope got a ride to Gainesville from Kim Daniels (*id.* at 305–07). Duncan testified that when the three of them returned to Bronson, Kim asked Hope for $5.00 (*id.* at 307). After Kim had dropped Duncan and Hope off at the Dollar Store in Bronson, they realized that they both had paid Kim $5.00, so they started walking to find her (*id.* at 307–08). Duncan and Hope saw Kim in her car with her son Kurtis, and they met up with her on Pine Street in the area of the Tree (*id.* at 308–09). Before they could ask Kim about the $5.00, she said she did not have it (*id.* at 309). Kim had crack cocaine in her hand, and she

turned to Kurtis and said, "Didn't I give you $5.00 for this?" (*id.*).  Kurtis responded

yes (*id.*).  Ms. Duncan testified Kim and Kurtis drove to the Tree, and she and Hope

walked there too (*id.* at 310).  Duncan testified Kurtis said something to Cosmo, and

Cosmo went to his car, opened the trunk, and retrieved something out of a bag (*id.*).

Cosmo told Hope that his mom (Kim) did not have his money (*id.* at 311).  Cosmo

stated he would "kill a nigger about his mom" (*id.*).  Duncan testified Hope

responded, "You're going to shoot me about some money that your mom got from

me?" (*id.*).  Cosmo responded, "Ain't no nigger . . . going to mess with my mom."

(*id.*).  Cosmo then told Hope that he "had somebody that wanted to knock him

[Hope] out" (*id.* at 312).  Hope told Cosmo to go get the person (*id.*).  Cosmo got in

the car and drove down the road (*id.*).

Duncan testified she and Hope left the Tree and walked to Hope's mother's

house on Boundary Street (Ex. D at 312).  As they were walking on Pine Street

toward Boundary, Cosmo approached in his car from the opposite direction at a high

rate of speed as if he was trying to hit them (*id.* at 312–13).  Cosmo pulled to the

side of the road and got out of the car (*id.* at 313).  Cosmo lifted up his shirt and

revealed a black handled gun, and then put his hand on the gun (*id.*).  Cosmo

continued to say he would "kill a nigger about his f****** mom" (*id.* at 313–14).

Another car approached, so Cosmo got in his car but continued to threaten Hope (*id.*

at 314).  Duncan and Hope continued walking, and as they turned onto Boundary Street, Duncan saw Cosmo and Kurtis come down the street and park in a field next to an abandoned house (*id.* at 315).  It appeared to Duncan that Cosmo put something under the seat of the car, and then Cosmo jumped out of the car with his shirt off (*id.*).  Kurtis jumped out of the car too, and Cosmo told Hope to "fade," meaning, Cosmo wanted to fight (*id.*).  Cosmo did not have a gun, but he was holding a bottle, and Kurtis was holding brass knuckles and a bottle (*id.*).  The three argued, and Ms. Greenlee came out of her house and told Cosmo not to hit her car, because Cosmo was attempting to throw a bottle at Hope, and Hope was ducking (*id.* at 316–17).  Hope did not have anything in his hands except some CDs in a case (*id.* at 316).  Cosmo told Kurtis to "go get that," and Kurtis went to the car (*id.* at 317).  Duncan and Hope ran to Hope's house (*id.* at 317–18).  Duncan saw Cosmo circle the block, so she and Hope decided to leave Bronson and go to Gainesville until things calmed down (*id.* at 318).

Ms. Duncan testified she and Hope went to Gainesville and then returned to Bronson an hour or two later (Ex. D at 319).  Duncan testified they drove to the Citgo store behind the Tree (*id.*).  She testified they were driving through an area referred to as "the cut," which is a pathway by the Tree which leads to the store, when Dennis Neal called to Hope (*id.*).  Hope turned the car around, and Duncan

saw Cosmo getting something out of the trunk of his car and placing it under his shirt (*id.* at 319–20).  Duncan did not see what Cosmo put under his shirt (*id.* at 320).  Cosmo started arguing with Hope, and Hope responded, "Man, we still on this?  We don't need to go through this.  We's [sic] cousins." (*id.*).  Cosmo responded, "We ain't [sic] cousins.  F*** nigger, I'm running Bronson now." (*id.*).  Duncan saw Kurtis Daniels standing near Cosmo's car (*id.*).  Kurtis picked up two bottles, and Cosmo told Kurtis to hit Hope with the bottles because Hope was "hanging out of the car" (*id.* at 321).  Hope told Kurtis, "You don't want to do that." (*id.*).  Duncan saw Kurtis "flinch" in a throwing motion, like he was going to throw a bottle, so she and Hope leaned back in the car (*id.*).  Hope then grabbed a gun from the back seat and told Kurtis not to throw the bottle (*id.*).  Kurtis made a throwing motion, and Hope fired shots (*id.*).  Duncan testified during this time, she saw Cosmo standing by his car with his hand under his shirt (*id.* at 324–25).  Duncan testified she did not see a gun, but she believed Cosmo was holding a gun under his shirt (*id.*).  Duncan testified Hope then drove away, and they drove to Tampa (*id.* at 325).

Ms. Duncan testified the gun was hers, and she brought it from Tampa to sell to a friend of Hope's (Ex. D at 322).  Duncan testified the next morning, her sister told her that Hope was "on the Internet as wanted" (*id.* at 325).  Duncan testified she called the Levy County Sheriff's Office and told an officer she was the shooter and

would return to the area (*id.* at 325, 327).  Duncan testified Hope spoke with an investigator, who assured him he would be safe if he turned himself in (*id.* at 327).  Duncan testified she and Hope returned, and Hope turned himself in (*id.*).

On cross-examination, Ms. Duncan testified the gun was loaded when she packed in it the car in Tampa prior to coming to Bronson (Ex. D at 330).  Duncan admitted she had testified in her pre-trial deposition that the gun was not loaded (*id.* at 330–31).  Duncan explained the discrepancy by stating she lied in her deposition because she thought she would be in trouble if she admitted she loaded it, because she "bought it off the street" and did not have any "paperwork" for the gun (*id.* at 331).  Ms. Duncan testified the gun was in a zippered bag and was zipped closed prior to Hope's retrieving it (*id.* at 332–33).

Hope testified on his own behalf (Ex. D at 339).  Hope testified he paid Kim Daniels $10.00 to drive him and Ms. Duncan to Gainesville (*id.* at 343).  Hope testified he also put gas in Kim's car (*id.*).  He testified that when they returned to Bronson, Kim asked him for more money, and he agreed to give her $5.00 (*id.* at 344).  Hope testified Kim took him and Ms. Duncan to the Dollar Store, and while Duncan was in the store, Hope sat in Kim's car and talked to Dennis Neal (*id.* at 344–45).  Hope testified Neal told him that Cosmo and Kurtis Daniels had "jumped" a man the previous night, and Cosmo lost some oxycodone pills he was carrying (*id.*

at 345).  Hope testified Neal asked him if he had any of the pills, and Hope responded

he had two or three, but Cosmo's mother had the rest (*id.*).  Hope testified he and

Ms. Duncan mistakenly overpaid Kim Daniels by $5.00 (*id.* at 345–47).

Hope testified Ms. Duncan insisted on getting the $5.00 back, so they walked

down Pine Street looking for Kim (Ex. D at 347).  Hope testified they saw Kim and

Kurtis in Kim's car, and flagged her down (*id.*).  Hope testified Kim said she didn't

have any money (*id.* at 347–48).  Hope described the interaction as follows:

> You know, my lady, she make [sic] minimum wage.  You know
> what I'm saying?  So she feeling [sic] like she really wanted—You
> know what I'm saying—she wanted to confront her about that money.
> But it really wasn't to that situation to where it was a severe thing, but
> she wanted to look in her face.
>
> How we end up to the tree, though, Mr. Bryant, to answer your
> question, sir, is that I told Kurtis, I say, Well, man, you know—
> Basically, what I'm saying now is, like, Man, you know, that's my lady
> money [sic].  I know y'all remember me from when I was around here
> in '06, you know, selling dope.  I had it.  I could nonchalantly just throw
> money like that.  I said, but that my lady money [sic], man.
>
> And she [Kim] had a rock laying by the console.  And he [Kurtis]
> was like, Man, she ain't [sic] spend—you know, she say, Kurtis, tell
> him I ain't [sic] spend nothing but $5.  Tell him I ain't [sic] spend
> nothing but $5.  He like, Huh?  Oh.  She ain't [sic] spend nothing but
> $5, man.  That's all she spunt [sic] with me.
>
> So, anyway, we end up getting to the tree, though, because Kurtis
> was like, if you don't like it, get there, basically, saying if you want to
> fight, we can fight.  So that's how I end up to the tree.  It wasn't about
> the $5.  He called me out.

(Ex. D at 348–49).

Hope testified he and Ms. Duncan walked to the Tree, and as soon as they arrived, Kurtis ran to Cosmo and "tapped" him (Ex. D at 350). Hope testified Cosmo ran to the trunk of the car, opened the trunk, and retrieved a gun from a bag (*id.*). Hope testified he told Cosmo, "You know how your mama is" (*id.* at 350–51). Cosmo told his mother that if she took something from Hope and Ms. Duncan, she needed to give it back, but his mother (Kim Daniels) denied she took the extra $5.00 (*id.* at 351). Hope testified Kurtis said something to Cosmo, and Cosmo told Hope, "Nigger, I'll kill you about my mama." (*id.*). Hope testified he told Cosmo he was not going to kill or touch Kim, and that the argument was between Kim and Ms. Duncan (*id.* at 352–53). Hope testified Kurtis was "egging Cosmo on" (*id.* at 353). Hope testified he put his hands up and told Cosmo and Kim he was unarmed (*id.*). Hope said, "You going to kill me about $5.00?" (*id.*). Hope testified Cosmo apologized and said he didn't have to kill Hope about $5.00, because he knew someone who wanted to "jump" Hope and knock him out (*id.*). Hope testified he told Cosmo he would rather be beat up than shot, and to go get the person and put the pistol away (*id.*). Hope testified Cosmo got in the car and left, and Hope and Ms. Duncan started walking on Pine Street to Boundary Street (*id.* at 354).

Hope testified just two minutes later, Cosmo came speeding down Pine Street and swerved over to where they were walking (Ex. D at 354–55). Cosmo then jumped out of the car, reached under the seat, and grabbed the pistol again (*id.* at 355). Hope testified Cosmo said, "Nigger, I'll kill you. I'll kill you about my mama" (*id.* at 355–56). Hope testified they were interrupted by a pedestrian, so Hope and Ms. Duncan walked away, and Cosmo drove away (*id.* at 356). Hope testified he and Ms. Duncan were in front of the Greenlee's house when Cosmo pulled up again, and Kurtis was with him (*id.* at 356–57). Hope testified Cosmo and Kurtis got out of the car, and Cosmo said he was not going to shoot Hope, but he was going to knock him out (*id.* at 357). Hope testified Kurtis put on brass knuckles, and both Kurtis and Cosmo grabbed bottles and started walking toward him (*id.*). Hope testified Cosmo threw a bottle at him but missed (*id.* at 357–58). Hope ran behind Ms. Greenlee's car and told Cosmo to throw the other bottle (*id.*). Ms. Greenlee told everyone to get away from her car (*id.* at 358). As Hope and Ms. Duncan were trying to leave, Hope dropped the CDs he was holding, and Ms. Duncan spilled the contents of her purse in the road (*id.*). Hope testified as he was trying to pick up their belongings, Cosmo told Kurtis to "go get that" (*id.* at 359). Hope thought Cosmo was referring to the gun (*id.*). Hope testified he and Ms. Duncan began running, because Kurtis got in the car and started driving towards them (*id.*). Hope testified

he and Ms. Duncan arrived at his mother's home, and Kurtis threatened to "shoot up" his mother's house (*id.* at 360).

Hope testified he and Ms. Duncan decided to leave Bronson (Ex. D at 361–63). Hope testified he was afraid for his own safety and Ms. Duncan's (*id.* at 363). He testified when they returned to Bronson, they went to the store near the Tree to get something to drink (*id.*). Hope testified he drove through the "cut" near the Tree, and Cosmo waved him down (*id.* at 364). Hope testified he turned around because he thought their problem was resolved (*id.*). Hope testified he did not think Cosmo and Kurtis were planning to threaten or hurt him (*id.*). Hope testified he immediately opened the car door and said, "Man, I know we ain't [sic] going through this about $5.00" (*id.*). Kurtis Daniels responded that he had plenty of money, and Hope asked, "Well, what's the problem?" (*id.* at 365). Hope testified while he was talking, Kurtis grabbed two quart-sized bottles and Cosmo opened the trunk and grabbed a gun (*id.*). Cosmo told Kurtis to throw a bottle at Hope, and if Hope moved, he (Cosmo) would "off" Hope (*id.* at 366–67). Kurtis was moving the bottle in the same way he did when he previously threw a bottle at Hope and Ms. Duncan (*id.*). Hope thought Kurtis was going to throw the bottle and said, "Cuz, don't do that, dog" (*id.* at 367–68). Hope testified:

> So when Kurtis do [sic] that, I put my hand out the window, and he jerked up with me and Demetria, and my brother-in-law he jerked back, too—You know what I'm saying?  He just sitting back there blow [sic].
>
> And, so, like I say, Kurtis ain't [sic] even saying anything.  Kurtis is just, like, laughing, like, you know, got a smirk on his face—You know what I'm saying?  And so that's when I reached back—That's when I reached back into Demetria bag [sic].  I said, Man, listen, man—You know what I'm saying—I don't want no problems.

(Ex. D at 368).  Hope testified he pulled the gun out of the bag and shot twice at Cosmo (*id.* at 369).  Cosmo fell to the ground, but Hope thought Cosmo was going to shoot into the car, so Hope fired two more shots at Cosmo (*id.*).  Hope saw a bottle hit the driver's side window, so Hope shot once at Kurtis and then drove away (*id.*).  Hope testified he fired the gun because he was in fear for his life (*id.*).

Hope testified he and Ms. Duncan drove to Tampa, and then called Detective Morgan to arrange to turn himself in (Ex. D at 269–70).  Hope admitted he lied to police when he told them Ms. Duncan was the shooter (*id.* at 371–72).  Hope also admitted he had been previously convicted of four felonies (*id.* at 372).  Hope testified after he was booked into the jail, he asked to speak with Detective Morgan again, at which time he admitted he lied and admitted he was the shooter (*id.* at 373).

On cross-examination, Hope admitted there was a two-hour gap between the

three threats from Cosmo and Kurtis, and the fourth and final incident at the Tree

(Ex. D at 375–76).  The cross-examination continued:

> Q [by the prosecutor].  Did you go back to the same tree where
> you had been threatened with a firearm?
>
> A.  Yes, ma'am.
>
> Q.  Were the same people who threatened you there?
>
> A.  The same people, yes, ma'am.
>
> Q.  Okay.  And this time when you showed up, did you have a
> gun in your car?
>
> A.  I was on foot the first time.
>
> Q.  I said the fourth time.  When you showed up, after going to
> Gainesville, did you have a gun in your car?
>
> A.  Yes.  Demetria had a gun in the bag, yes, ma'am.
>
> Q.  Okay.  But you're in that car, too, and that gun's there because
> you used it, right?
>
> A.  Yes, ma'am.
>
> Q.  And you're a convicted felon.  Are you supposed to be around
> guns?
>
> A.  No, ma'am.

Q.  Okay.  You've stated previously that the defendant—or, I'm sorry—that Cosmo and Kurtis had also threatened your mother's house too; is that correct?

A.  Yes, ma'am.

Q.  So when you were shooting, was that on behalf of you, Demetria, and your mother?

A.  No, ma'am.

Q.  Well, who were you protecting?
. . . .
A.  . . . I was protecting who was on the scene at the time, me and my fiancée and my little brother-in-law in the back.

(Ex. D at 377–79).  The prosecutor asked Hope why he continued to shoot even after he hit Cosmo, and Hope responded he did not realize he shot Cosmo, and he continued to shoot because Cosmo still had a gun in his hand (*id.* at 381–82).  The prosecutor asked why Hope didn't go to the police instead of driving to Tampa (*id.* at 382–83).  Hope responded that he was a convicted felon and was scared (*id.* at 383).  Hope testified he was "high and drunk" when he lied to Detective Morgan (*id.* at 384).

During the prosecutor's first closing argument, he argued that the evidence satisfied all of the elements of each crime with which Hope was charged (Ex. E at 408–15).

Defense counsel argued Hope acted in self-defense:

MR. BRYANT:  Actually, there is a defense, and these will be in your jury instructions.  No duty to retreat.  If the defendant was not engaged in unlawful activity—He was going to the store and turned around and was flagged down and he was attacked in any place where he had a right to be, he had no duty to retreat.  He had a right to be at that place.  He thought that they were squashing it, as he said.

Aaron Hope shot Cosmo James.  We're not denying that.  That's what the State has charged him with, and that's what Mr. Hope admitted on the stand.  But what the State can't answer, what only Mr. Hope can answer, is why.  Why did Mr. Hope shoot Cosmo James?

. . . .

[H]e's charged with an aggravated assault against Kurtis Daniels; Kurtis Daniels, who admitted on the stand that he had brandished bottles at Mr. Hope; Kurtis Daniels, who there was testimony from Mr. Hope, from Demetria Duncan, and Mr. Greenlee that all saw him do this.  He admitted on the stand that he did it.  Mr. Hope told you he threw the bottle at him.  He had to duck and dodge, all the while carrying his CDs which he spilled all over the ground.  He had no weapon in his hand.  Nothing.

And who is Kurtis Daniels?  The brother of Cosmo James.

. . . .

Mr. Hope was firing at the two people that were threatening him.  As he took the stand and told you, when the prosecutor asked him the question, who were you firing at?  Were you firing at Anna Diefendorf?  I don't even know her.  I was firing at the gunman.  Who was the gunman?  According to David Lewis, Cosmo James.  According to Dennis Neal, Cosmo James.  According to Demetria Duncan, Cosmo James.  According to Aaron Hope, Cosmo James.  Four different people have placed a firearm in Cosmo James' hands, not once, not twice, but at least three different occasions where he brandished that gun and threatened to kill Aaron Hope.

$5?  You're going to kill me, man, over $5?  You heard Aaron Hope say that on the stand, and you heard Dennis Neal say that he heard those same words.  You're going to kill me, man, over $5.

What do people get killed with?  I submit to you guns is one of them.  And where did that gun come from?  Out of the back of that car, out of that orange and blue Gator bag, that not only did Aaron Hope and Demetria Duncan see, but Dennis Neal and David Lewis saw it too and Dennis Neal, not once, but twice.

So we look at the witnesses that we have.  We have two brothers and their girlfriends.  We have Aaron Hope and his girlfriend.  Now, it's probably a reasonable assumption to assume that a girlfriend is going to stand up for her boyfriend.  And let's say that's what Aaron Hope and his girlfriend did.  And let's say that's what Anna Diefendorf and Kurtis Daniels and Jessica Mylam did.  And then why don't we just toss out their testimony.  And what are you left with; William Veal, who didn't even know Aaron Hope.  William Veal, who took the stand and said Kurtis Daniels picked up two quart bottles and rushed the car.

Who else are you left with?  David Lewis.  David Lewis, who said, Man, I was up there.  I saw what I knew to be a gun.  And Mr. Bryan said, How good is your eyesight, and he goes and stands way over there by the door, and he holds up two fingers, and he asked, How many fingers do I have up?  And what did Mr. Lewis say?  Two.  And I asked him:  Was there any doubt in your mind what you saw him [Cosmo] take out of that bag?  And he described the bag too.  What he took out of that bag was a gun.  And he said no.  Now, he may not have been able to tell whether it was a revolver or an automatic, but he knew it was a handgun.  He knew it was black.  He knew Cosmo James pulled it out of that trunk.

And Dennis Neal, again, consistent with all the other disinterested witnesses that have no connection to this.  Those three witnesses, all of them place weapons in their hands, two of them specifically guns and one of them specifically two different occasions.
. . . .

They go over to the tree. . . .  They're walking, and by the time they get there, because of the incident at the car on Pine Street, Kurtis goes over to his brother and taps him and says something to him, says

something to him to the point that it causes him to go into the car, pop the trunk, as Dennis Neal said, pop the trunk, as David Lewis said, pop the trunk, as Demetria Duncan and Aaron Hope said, and reach in there and pull out his gun. He puts it in his waistband and holds his hand on it. Now, Members of the jury, if that isn't a threat, I don't know what is.

But it didn't just stop there. What did he say? I'll kill someone over my F-ing [sic] mother. Nobody's going to mess with my mother, repeated over and over again. So if someone says, I'm going to kill someone, they've got a gun in their waistband, they've got a hand on that gun, what is a reasonable person going to conclude, especially if they are the target of those statements? That their life is in danger. And it's reasonable to be afraid. Not only was his life in danger, but Miss Duncan was involved in this little altercation also. She was in danger.

In deciding whether defendant was justified in the use of deadly force, you must judge him by the circumstances by which he was surrounded at the time the force was used. The danger facing the defendant need not be actual, but in this case it was. However, to justify the use of deadly force, the appearance of danger must have been so real, like that black gun that several witnesses testified to that he pulled out of that car, not once but at least twice, that a reasonably cautious and prudent person under the same circumstances would have believed that the danger could be avoided only through the use of that force. Those aren't my words. Those are the instructions. Those are part of the instructions that the Judge will give to you, that you'll carry back into that jury room, part of the instructions that you're to use in deciding on a verdict in this case.

After several encounters, several encounters where both he and Miss Duncan were threatened from when Cosmo James went down the street to get someone who was supposed to knock Mr. Hope out, and came back alone in the car with the gun. Now, that wasn't only Mr. Hope's testimony. That wasn't only Miss Duncan's testimony. But Dennis Neal took the stand and he said, Well, Cosmo did leave by himself at first, which matches exactly what he said. And that was the

incident where the second time that gun was brandished at Mr. Hope and Miss Duncan.

He comes back because he doesn't have the person to knock him out and he gets his brother, and then he drives to Boundary Street, where by this time they had reached this time without the gun, but with the aid of brass knuckles on Kurtis Daniels and bottles, again, which, not only did Kurtis Daniels admit on the stand that he picked up the bottles, but Shaun Greenlee, who was in the house and saw this event unfold, Shaun Greenlee, who said they had bottles in their hands. He didn't see them throw it. Mr. Hope testified to that fact. Miss Duncan testified to that fact.

But Mr. Greenlee saw him with those bottles. And, Members of the jury, they weren't cleaning up the neighborhood. They were using those bottles as potential weapons. They were threatening them. And if it hadn't been for the second incident, the young person or man that would walk by and the third incident, the lady concerned about her vehicle coming out, we don't know how far they would have gone. But that still wasn't it. That's three separate encounters, and that still wasn't it, because they continued to drive through the neighborhood. And as Mr. Hope said, even outside of his home, his mother's home, they again threatened, I'll shoot up your mama's house. Your mother's not safe. I own this property now. I run Bronson. Those were the words spoken to Mr. Hope in front of his mother's house.

So, then, Mr. Hope, visibly upset because he tells his mother all about it, and he's so upset she's concerned, that she tells him, Take the car and just get away. So what do they do? They take the stuff out of the car that they had for the crab fest. They leave their luggage in there that they brought up from Tampa, and they drive to Gainesville. They go to a friend's house. They chill out.

A couple of hours passes, because they drove all the way to Gainesville and back, and they relaxed for a little while. And he said about a couple hours had passed, and he gets back and they go up to the store to get something to drink. And it's habit, Members of the jury,

habit that everybody has that when they go to that store, they go through the cut past the tree to the—and they park back there, and they go in the store to get what they want.

So Mr. Hope cuts through there, goes through the cut to go to the store. And Kurtis Daniels or Cosmo James flags him down. So Mr. Hope, who on all previous occasions unarmed, not threatening—You're going to kill me, man, over $5—thinks that he has calmed down, so why couldn't they have. Two hours have passed.

They're family, not by blood, by marriage, but he still refers to them as that. And even though he isn't related by blood, he still kind of considered them such. And they thought that it was quashed, that it was over. As Miss Duncan said, he was trying to mediate the situation, I believe was the word that she used.

But what did Mr. Veal say happened when Mr. Hope pulled up there? He said Kurtis Daniels immediately picks up two bottles and rushes toward the car. What did Mr. Neal say happened? That Cosmo James popped his trunk again, pulled out the gun. Kurtis Daniels, flinching like he's going to throw the bottles. They're in the car. They're leaning back. They don't have anywhere else to go. But, Members of the jury, that doesn't actually matter. They have no duty to retreat. Mr. Hope thought this incident was over. Could he have driven off? Cosmo James said, Bust him with that bottle. And if they drive off, I'm going to shoot up the car. I'm going to shoot.

So Mr. Hope is faced with a dilemma. You know, here is a man who has got a gun. He has threatened me at least three previous times with this gun. He has threatened to kill me over $5. Here is a man who has thrown bottles at me previously and threatened me with bottles. What is he to do? He's in fear of his life again. He finds himself in the same situation when he thought it was over, and so he protects himself. He shoots.

Members of the jury, the State talks about bullets flying everywhere, but there were two bullets found. Where were the two

bullets found?  One by Cosmo James and one in the area where Kurtis Daniels says he was.  Not a single bullet was found by Anna Diefendorf. Not a single bullet was found by Jessica Mylam.  Not a single bullet was found in the area where Jessica Mylam or Anna Diefendorf claimed that they were.  They both said they were behind the car.  One says that after the first shot rang out, I hit the dirt.  Now, the State says that she says that the gun was pointed at her, but the first shot hit Cosmo James who was at the rear of the car, and she was on the opposite side of the car.  So if the first shot hits him and she immediately hits the ground, how is she going to see the gun pointed at her?

The other girlfriend says when the first shot rang out, I pulled the second girl down.  She never saw the gun pointed at her.  Neither one of them had any kind of a beef with him.

Members of the jury, do you remember when Miss Diefendorf took the stand, and she said casings were falling all around her?  Now, if you look at the pictures that will be sent back with you when you go back to deliberate, you will see the area that was roped off with crime scene tape.  You will see the markers that were laid down to indicate where the casings were found.  None of those casings were found on the opposite side of the car where Miss Diefendorf claims that she was, where she says that she was.

So what happen [sic] to those casings that she said were falling around her, falling down around her?  And where did they come from? The State hasn't answered that question.  Could it possibly be from that second gun, that gun that Mr. Hope saw, that gun that Miss Duncan saw, that gun that Mr. Lewis saw, and that gun that Mr. Neal saw?

And, Members of the jury, when Officer Johnson—former Officer Johnson took the stand, I asked him the question, Where was Kurtis Daniels when you arrived on the scene?  He wasn't around his brother.  Did you search the car?  Did you look in the car?  No.  I think crime scene might have done that.  Did you pat anybody down?  No, I didn't do that.

And when the crime scene investigator took the stand, I asked her, Did you look into the car? Did you search the car? No, I didn't do that. What area did you search? Just that area that Officer Johnson had roped off. Did you look for any projectiles outside of that area? No, not really, just in the direction that Mr. Hope was firing.

Why wasn't Kurtis Daniels there? What happened to that gun that four separate witnesses saw? What happened to the casings, the casings that Miss Diefendorf testified were falling down around her, Miss Diefendorf, who placed herself near Cosmo James, Cosmo James, who was seen by four separate people with a gun? What's the answer to that question? What does that create in your mind? Isn't that something that needs to be explained?

There wasn't a single bullet hole mark or anything in that car, not one single bullet hole, not one shattered window, not one graze on the surface of the car, not one nick from a bullet. The only two bullets found were next to Cosmo James near Kurtis Daniels, the only two people other than Mr. Hope at the time of the shooting that had weapons, that threatened with weapons.
. . . .
Here he is in a car thinking that this incident is over with and they pull a gun on him again. They throw a bottle at him and strike the car. He reacted the only way he thought he had to, the only way that he could, to protect himself, to protect Miss Duncan, to protect the third person in the car.

Members of the jury, there's no premeditation. Mr. Hope should be found not guilty of attempted first degree murder. Mr. Hope was merely defending himself, defending his fiancée, from people who had threatened him several times over that day, threatened him with bottles, threatened him with guns, threatened him with brass knuckles, threatened his mother, threatened him, telling him he better get out of Bronson, that they ran Bronson.

Aggravated battery against Cosmo James. Again, Members of the jury, he was acting in self-defense, defense of himself and defense

of others.    And it's permissible.    The Judge will tell you that it's permissible to meet that force with what you feel is necessary if you are threatened.

. . . .

Aggravated assault against Kurtis Daniels; Kurtis Daniels, who threatened Mr. Hope with bottles and brass knuckles and threw a bottle at him and threw a bottle at his car while he was in it.  That's where the projectiles were found, Members of the jury, at the two people that had threatened him numerous times, and that is self-defense.

It can't be any plainer.  This is evidence that's given to you, not only by Mr. Hope and Miss Duncan, but by three witnesses who have no ties to either side.  The only true and correct verdict in this instance is a verdict of not guilty as to all of the charges.

(Ex. E at 415–31).

The prosecutor addressed Hope's self-defense theory during his second closing argument:

I know one thing the defense did not say to you during that entire closing argument.  They did not explain to you why Mr. Hope went back to that convenience store with a loaded firearm, why he took the opportunity to get it, to load it, and to have it readily available when he went back to confront Cosmo James and Kurtis Daniels.  The reason he didn't—The reason that was not explained to you, ladies and gentlemen, is because there isn't an explanation.  It doesn't fit into their theory of the case, and it can't be explained away, and it abolishes their entire argument in regards to self-defense.

Now, the defense conveniently read to you a portion of the self-defense instruction, but what you didn't hear later, ladies and gentlemen, is this particular part.  If you find the defendant, who, because of threats or prior difficulties with Cosmo—And that's what they have asserted—had reasonable grounds to believe that he was in

danger of death or great bodily harm at the hands of Cosmo, then the defendant had a right to arm himself.

However, the defendant cannot justify the use of deadly force, if, after arming himself, he renewed his difficulty with Cosmo when he could have avoided the difficulty. He cannot justify the use of deadly force, if, after arming himself, he renewed his difficulty, which is exactly what we have here, ladies and gentlemen. He left.

He knew the gun was there. They were going to sell it and get some money for rent, even though he didn't have any business being in possession of it. He got it. He took the clip. He loaded it, and he fired seven shots.

Now, the defendant's own testimony is that the only person that he was trying to defend himself from was Cosmo James. But the defense just argued to you that he was trying to defend himself against Kurtis Daniels and Cosmo James, but that's not what the defendant testified to on the stand.

Mr. Bryant has told you that the defendant has given you all the evidence that you need to find him not guilty. That's simply not the case.

Based on his own testimony, he shot at Kurtis Daniels. He said he only shot—Excuse me. He only shot at Cosmo James. He didn't shoot at anyone else. He said, as Mr. James is falling to the ground, he has got the gun like this, and he's shooting a [sic] him the entire time. But the physical evidence does not bear that out because we know— Even the defense argued it to you in their closing—there is a bullet on the ground right where Kurtis Daniels was. So either the physical evidence is lying or Mr. Hope is lying.
. . . .
Now, if you believe Mr. Hope's version of the events, you still have to determine whether or not Mr. Hope was reasonable in acting in the manner that he did. Was he reasonable in using deadly force? The

State would argue to you that he was not, that he had no business doing what he did. However, you must determine is he reasonable.

Now, did Mr. Hope act in a reasonable manner? He's a rapper. He testified that to you. He had been disrespected all day, according to him.

. . . .

He had lost credibility on the street, in front of his lady. He's a convicted felon. He's carrying a loaded firearm. Do any of those things sound to you like a reasonable person? I submit to you no.

A reasonable person would have called the police. A reasonable person would not have gone back to the tree. A reasonable person probably would not have come back to Bronson, for goodness sakes. But that's not what Mr. Hope did. And the reason he didn't is because he had agenda. He had a plan, a premeditated action. He was going to that tree with the intent to do nothing else but to show them who was boss.

It sounded almost as if the defense was arguing to you that this was some giant conspiracy against Mr. Aaron Hope. There was a second gun. There was a bunch of bullets that were picked up. There were people hiding stuff as all this was going on. I would submit to you that there's a very reasonable explanation as to why law enforcement did not search Anna Diefendorf's vehicle after this encounter occurred. They didn't have to. They had no reason to believe that Cosmo James had a gun, because he didn't.

The only person or people that could have told law enforcement that were gone. Do you know who that is? Aaron Hope. And you know why he was gone? Because he knew that he had tried to kill someone. And he was consciousness [sic] of that guilt, and he fled.

Did he turn himself in the next day? Nope. Second day? Huh-uh. Third day? Fourth day? Five days later, after he had concocted a story as to what really happened, he decides to turn himself in. Does

that sound like a person who is acting in self-defense to you, ladies and gentlemen, who believes that they did nothing wrong?  No.

In fact, if he did nothing wrong, why didn't he bring the gun back to law enforcement?  Say, Hey, this is the gun I used.  Yeah, I shot him, but I was acting in self-defense.  No gun.

(Ex. E at 433–41).

The prosecutor's asking the question, "And you're a convicted felon.  Are you supposed to be around guns?" placed Hope's character in issue.  *See Dawkins v. State*, 605 So. 2d 1329, 1330 (Fla. 2d DCA 1992) ("The mere asking of the question . . . pointed out to the jury that Dawkins was unlawfully carrying a firearm as a convicted felon.  This placed his character in issue . . . ."); *Wilt v. State*, 410 So. 2d 924, 925 (Fla. 3d DCA 1982) ("While the fact that a defendant has previously been convicted of a crime is relevant to his credibility, once that admission has been obtained, further questioning must be viewed as an attempt to attack character."). Such an attack deprives the defendant of a fair trial.  *See Dawkins*, 605 So. 2d at 1330; *Wilt*, 410 So. 2d at 925 ("For nearly one hundred years, it has been the law in Florida that unless a defendant has placed his character in issue, such an attack deprives him of a fair trial and constitutes reversible error.") (citing *Lewis v. State*, 377 So. 2d 640 (Fla. 1980); *Young v. State*, 195 So. 569 (Fla. 1939); *Mann v. State*, 22 Fla. 600 (Fla. 1886)).

Additionally, the prosecutor referred to that fact (that Hope was a convicted felon carrying a loaded firearm) in closing argument.  The prosecutor's placing Hope's character at issue was prejudicial because the jury was less likely to believe that Hope was defending himself if they knew he had a propensity to act unlawfully. *See Dawkins*, 605 So. 2d at 1330.

The State points to the testimony of other witnesses that contradict Hope's account of the circumstances preceding the shooting, arguing that such evidence is overwhelming evidence that Hope did not act in self-defense.  But there was also testimony that supported Hope's account.

It must be remembered that the question on federal habeas review is not whether Hope established *Strickland* prejudice, but whether **any reasonable jurist could conclude, as did the First DCA, that Hope did not establish *Strickland* prejudice**.  *See Richter*, 562 U.S. at 103 (the federal habeas petitioner must demonstrate that the state court's determination was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement"); *see id.* at 105 (when § 2254(d) applies, the question is not whether counsel's actions were reasonable; the question is whether there is any reasonable argument that counsel was not ineffective under *Strickland*); *accord Bobby v. Dixon*, 565 U.S. 24, 132 S. Ct. 26, 181 L. Ed. 2d 328

(2011) (per curiam); *see also Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1258 (11th Cir. 2012).

It is a very close call, but the undersigned concludes that a reasonable jurist could conclude that there was no reasonable probability the jury would have had any reasonable doubt that Hope was not justified in the use of deadly force, even if the prosecutor had not brought out the fact that Hope was not supposed to possess a gun. The *overwhelming evidence* showed that Hope armed himself and renewed his difficulty with Cosmo and Kurtis, *one to two hours after their last encounter*, when he could have avoided it by not returning to the Tree for yet another encounter. Considering the events of the day and the totality of the evidence, it is apparent the jury simply did not believe that Hope drove by the Tree the last time just to buy a drink at the store. Moreover, none of the witnesses, except Hope, testified that after Hope returned to the scene that last time **Cosmo** flagged him down or waved him over to the Tree when the difficulty between them was renewed for the final time— even Hope's girlfriend did not testify that **Cosmo** flagged them down, instead she testified that Hope turned the car around and pulled up to the "Tree" after Dennis Neal called to Hope. And Hope's credibility was undermined not only by his admission that he was a convicted felon (which was appropriate impeachment) but also by his admission that he initially lied to Investigator Morgan and claimed that

Ms. Duncan was the shooter.  Additionally, Hope freely offered evidence of his bad character by testifying he previously sold "dope," and testifying he told Dennis Neal he had (i.e., illegally possessed) two or three oxycodone pills that Cosmo had dropped the night before.

Further, Hope's own testimony suggested he renewed the difficulty with Cosmo and Kurtis.  Hope testified that when he turned around and went back to the Tree, he did not think Cosmo and Kurtis were planning to threaten or hurt him; yet he immediately opened the car door and said, "Man, I know we ain't [sic] going through this about $5.00."  Hope testified Kurtis responded that he had plenty of money, and Hope asked, "Well, what's the problem?"

A reasonable jurist could conclude that Hope was not prejudiced by defense counsel's failure to object to the prosecutor's character attack (by eliciting and referencing the fact that Hope was not supposed to possess a gun), because the overwhelming evidence refuted Hope's self-defense theory beyond a reasonable doubt.  Hope has not satisfied the "doubly deferential" standards created by *Strickland* and § 2254(d).  *See Richter*, 562 U.S. at 105.  Therefore, he is not entitled to federal habeas relief on this aspect of Ground One.

> b.    Counsel's failure to object to the "unlawful activity" language of the standard jury instructions as to § 776.013 or seek modification of the instructions to clarify that Hope's act of

> possessing a firearm could not be deemed "unlawful activity" for
> purposes of determining whether he acted in self defense

The last state court to adjudicate the merits of this claim was the First DCA in the second post-conviction appeal.[5]  In Ground A(a) of Hope's second Rule 3.850 motion, he argued defense counsel was ineffective for failing to seek jury instructions which clarified that the jury could find his conduct was justified if it found he was justified under **any** of the justification statutes, § 776.012, § 776.013(3), or § 776.031; and he did not have to meet the requirements of **all** of those statutes (Ex. GG at 5).  In Ground A(h) of Hope's second Rule 3.850 motion, he argued defense counsel was ineffective for failing to seek modification of the standard jury instructions on self-defense to clarify that neither the charged crimes nor Hope's being a convicted felon in possession of a firearm qualified as "unlawful activity" which imposed a duty to retreat (Ex. GG at 21–22, 33–36).  Hope supplemented his Rule 3.850 motion with Ground A(k), in which he contended defense counsel was ineffective for failing to request a jury instruction which instructed the jury that in certain circumstances, a convicted felon may lawfully

---

[5] The First DCA also adjudicated the merits of the claim in the first post-conviction appeal, but since that adjudication was not the court's **last** adjudication, it is not the relevant state court decision for purposes of § 2254(d).  *See Holland v. Florida*, 775 F.3d 1294, 1308 (11th Cir. 2014) (the last state court adjudication of the federal claim on the merits is the decision that the federal habeas court must afford deference under the AEDPA).

possess a firearm and is thus not precluded him from availing himself of self-defense

(*id.* at 27–32) (citing *Marrero v. State*, 516 So. 2d 1052 (Fla. 3d DCA 1987)).

The state circuit court provided a reasoned decision on Hope's IATC claims

(Ex. HH at 37–45).  The court cited the *Strickland* standard as the governing legal

standard (*id.* at 40).  The court then adjudicated these specific IATC claims as

follows:

> As to Ground (A)(a), Defendant alleges that "[a]ll [the] Self-Defense Instructions were cobbled together."  The self-defense instruction which was used at Defendant's trial is the standard jury instruction on the justifiable use of deadly force.  *See* Jury Instruction.  "[T]rial counsel's failure to object to standard jury instructions that have not been invalidated by this Court does not render counsel's performance deficient."  *Thompson v. State*, 759 So. 2d 650, 665 (Fla. 2000).  Accordingly, the claim raised is without merit.
>
> As to Ground (A)(h), Defendant alleges that "[c]ounsel failed to seek instructions and explain to the jury that the charged offense could not be considered 'unlawful activity.'"  Counsel did explain to the jury that Defendant was not engaged in unlawful activity at the time of the charged offenses.  *See* Trial Transcript at 415 (lines 5–12).  Furthermore, there is no indication from the record that the jury was confused by the jury instruction as given.  Accordingly, the claim raised is without merit.
>
> . . . .
>
> As to Ground (A)(k), Defendant alleges that "[t]rial counsel provided constitutionally ineffective assistance by not requesting the appropriate jury instruction of 'necessity' explaining to the jury a convicted felon in certain circumstances may possess a firearm based on *Marrero v. State*, 516 So. 2d 1052 (Fla. 3d DCA 1987)."  Defendant was neither charged with nor convicted of Possession of a Firearm by a Convicted Felon.  Thus, the *Marrero* case is not relevant to

Defendant's case.  *Id.*  Furthermore, because Defendant was not charged with Possession of a Firearm by a Convicted Felon, he would not have been entitled to a necessity defense.  It is important to note that Defendant presented a self-defense defense; and that the jury was instructed as to that defense.

(Ex. HH at 40, 43–44).  The First DCA affirmed the circuit court's decision without explanation (Ex. II).

The three Florida statutes pertaining to Hope's self-defense (justifiable use of deadly force) at the relevant time were Florida Statutes §§ 776.012, 776.013, and 776.031 (*see* ECF No. 5 at 22–23).  Section 776.013, known as the "Stand Your Ground" law, includes the "unlawful activity" language which Hope contends required a clarifying instruction.  The effect of the 2005 enactment of the Stand Your Ground law on the existing justifiable use of deadly force statutes was summarized by one Florida court as follows:

> Prior to the enactment of the Stand Your Ground law, the justifiable use of deadly force by and against a civilian was governed by section 776.012.  Section 776.012, Florida Statutes (2004), permitted the use of deadly force if a person "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony."  Section 776.031 governed the use of force in defense of others, and it permitted the use of deadly force if a person "reasonably believes that such force is necessary to prevent the imminent commission of a forcible felony."  In addition, the Florida Supreme Court recognized a common law duty to retreat that required a person to "retreat to the wall" or use "every reasonable means within his or her power to avoid the danger."  *Weiand v. State*, 732 So.2d 1044,

1049, 1050 (Fla. 1999). There was an exception to the duty to retreat for a person claiming self-defense in his or her own residence; that exception was part of the "castle doctrine." *Id.*

In 2005, the legislature enacted the Stand Your Ground law which amended sections 776.012 and .031 and created sections 776.013 and .032. Ch. 2005–27, §§ 1–4, at 200–02, Laws of Fla. Section 776.012 still permits the justifiable use of deadly force if a person "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony." § 776.012(1). But the Stand Your Ground law added language permitting the justifiable use of deadly force "[u]nder those circumstances permitted pursuant to s. 776.013." § 776.012(2). It also eliminated the common law duty to retreat for persons justifiably using deadly force under either section 776.012(1) or 776.013.

Section 776.012, which is entitled "Use of force in defense of person," now provides as follows:

A person is justified in using force, except deadly force, against another when and to the extent that the person reasonably believes that such conduct is necessary to defend himself or herself or another against the other's imminent use of unlawful force. However, a person is justified in the use of deadly force and does not have a duty to retreat if:

(1) He or she reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony; or

(2) Under those circumstances permitted pursuant to s. 776.013.

As for section 776.013, it is entitled "Home protection; use of deadly force; presumption of fear of death or great bodily harm." Subsections (1), (2), (4), and (5) of section 776.013 expand the "castle" to include a dwelling, residence, or occupied vehicle.  These subsections all work together to provide for presumptions that make it easier for a person in the "castle" to establish the justifiable use of deadly force.  Subsection (1) sets forth a presumption of "a reasonable fear of imminent peril of death or great bodily harm." § 776.013(1). Subsection (2) sets forth four circumstances in which the presumption in subsection (1) does not apply, including when "[t]he person who uses defensive force is engaged in an unlawful activity."  § 776.013(2)(c). Subsection (4) sets forth a presumption that "[a] person who unlawfully and by force enters or attempts to enter a person's dwelling, residence, or occupied vehicle is presumed to be doing so with the intent to commit an unlawful act involving force or violence." § 776.013(4). And subsection (5) defines "dwelling," "residence," and "vehicle." § 776.013(5).

Subsection (3) . . . applies to "[a] person who is not engaged in an unlawful activity and who is attacked in any other place where he or she has a right to be." § 776.013(3).  It eliminates the duty to retreat for this law-abiding person.  It also provides for the use of deadly force by this law-abiding person based upon the reasonable belief "it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a forcible felony." *Id.*

*Little v. State*, 111 So. 3d 214, 219–21 (Fla. 2d DCA 2013) (footnotes omitted).

In Hope's case, the court instructed the jury as follows, in relevant part:

An issue in this case is whether the defendant acted in self-defense.  It is a defense to the offense with which Aaron Sylvester Hope is charged if the injury to Cosmo James resulted from the justifiable use of deadly force.

"Deadly force" means force likely to cause death or great bodily harm.

The use of deadly force is justifiable only if the defendant reasonably believes that the force is necessary to prevent imminent death or great bodily harm to himself while resisting:

    l.     another's attempt to murder him, or

    2.     any attempt to commit Aggravated Assault with a Deadly Weapon upon him, or

    3.     any attempt to commit Aggravated Assault with a Deadly Weapon upon or in any dwelling, residence, or vehicle occupied by him.

. . . .

A person is justified in using deadly force if he reasonably believes that such force is necessary to prevent

    1.     imminent death or great bodily harm to himself or another, or

    2.     the imminent commission of Aggravated Assault of [sic] a Deadly Weapon against himself or another.

. . . .

In deciding whether defendant was justified in the use of deadly force, you must judge him by the circumstances by which he was surrounded at the time the force was used. The danger facing the defendant need not have been actual; however, to justify the use of deadly force, the appearance of danger must have been so real that a reasonably cautious and prudent person under the same circumstances would have believed that the danger could be avoided only through the use of that force. Based upon appearances, the defendant must have actually believed that the danger was real.

If the defendant was not engaged in an unlawful activity and was attacked in any place where he had a right to be, he had no duty to retreat and had the right to stand his ground and meet force with force, including deadly force, if he reasonably believed that it was necessary to do so to prevent death or great bodily harm to himself or another or to prevent the commission of a forcible felony.

. . . .

If you find that the defendant who because of threats or prior difficulties with Cosmo James and/or Kurtis Daniels had reasonable grounds to believe that he was in danger of death or great bodily harm at the hands of Cosmo James and/or Kurtis Daniels then the defendant had the right to arm himself. However, the defendant cannot justify the use of deadly force, if after arming himself he renewed his difficulty with Cosmo James and/or Kurtis Daniels when he could have avoided the difficulty, although as previously explained if the defendant was not engaged in an unlawful activity and was attacked in any place where he had a right to be, he had no duty to retreat.

If in your consideration of the issue of self-defense you have a reasonable doubt on the question of whether the defendant was justified in the use of deadly force, you should find the defendant not guilty.

However, if from the evidence you are convinced that the defendant was not justified in the use of deadly force, you should find [him] [her] guilty if all the elements of the charge have been proved.

(Ex. A at 60–62).

At the time of Hope's trial, at least one Florida court had noted **in dictum** that the jury instruction imposing a duty to retreat on a defendant who employs self-defense while "engaged in unlawful activity" was confusing where the defendant was not engaged in any unlawful activity other than the crimes for which he asserted the self-defense justification. *See Novak v. State*, 974 So. 2d 520, 522 (Fla. 4th DCA

2008) (citation omitted) (emphasis added).[6]  Following *Novak*, and just two months prior to Hope's trial, the Florida Supreme Court amended the standard instructions **to include a citation to *Novak***, clarifying that the "no duty to retreat" rule applies to situations where the defendant was not engaged in unlawful conduct beyond that for which he asserted justification.  *In re Standard Jury Instructions in Criminal Cases—Report No. 2009-01*, 27 So. 3d 640, 641, 643–44 (Fla. Jan. 7, 2010) (emphasis added).  The Florida Supreme Court did not invalidate or change the language of the standard jury instructions.  *See id.*

Hope contends defense counsel should have sought instructions to clarify that the other predicated offenses of assault during the shooting could not constitute "unlawful activity" for purposes of the self-defense instructions.  As previously discussed, counsel's performance is deficient when it falls below an objective standard of reasonableness and is "outside the wide range of professionally competent assistance."  *Johnson v. Sec'y, DOC*, 643 F.3d 907, 928 (11th Cir. 2011) (quotation omitted).  The "test has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done.  We ask

---

[6] The holding in *Novak* was that the trial court committed fundamental error when it instructed the jury that the justifiable use of non-deadly force required the defendant to prove the defense beyond a reasonable doubt.  974 So. 2d at 521–22.

only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc) (quotation marks omitted).  Hope must therefore establish that "no competent counsel would have taken the action that his counsel did take." *Chandler*, 218 F.3d at 1315.  Here, the required objective inquiry into counsel's performance entails asking whether any reasonable lawyer could have elected not to request a clarifying instruction, not whether Hope's actual counsel was subjectively motivated by specific reasons. *See Castillo v. Fla. Sec'y of DOC*, 722 F.3d 1281, 1285 n.2 (11th Cir. 2013).

As an initial matter, this federal habeas court must defer to the state court's construction of its own laws and jury instructions. *See Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005) (federal habeas court must abide by state court's interpretation of state law).  Therefore, the court defers to the state court's determination that the self-defense instructions which were given at Hope's trial were the standard jury instructions approved for use by the Florida Supreme Court.  Although Hope's defense counsel could have asked the court to add a clarifying instruction stating that the "no duty to retreat" rule applied to situations where the defendant was not engaged in unlawful conduct beyond that for which he asserted justification, counsel's allowing the supreme-court-approved standard jury

instructions to be given did not render counsel's performance deficient.    *See Black v. United States*, 373 F.3d 1140, 1144–46 (counsel's ignorance of a well-defined legal principle could be inexcusable and demonstrate ineffective performance by counsel, but if the legal principle at issue is unsettled, counsel will not have rendered deficient performance for an error in judgment; thus, if a reasonable attorney in counsel's position could have concluded that a given portion of an opinion was *dictum* discussing an unsettled question of law and not binding authority for his case, that attorney's performance will not be deemed deficient for not raising that issue to the court) (citations omitted); *see also, e.g., Conrad v. Sec'y, Fla. Dep't of Corr.*, 663 F. App'x 746, 752 (11th Cir. 2016) (unpublished but recognized as persuasive authority) (trial counsel's failure to object to standard jury instructions that had not been invalidated by the Florida Supreme Court does not render counsel's performance deficient).

Additionally, the state court reasonably found that Hope's counsel explained to the jury that Hope was not engaged in unlawful activity at the time of the charged offenses.    And Hope failed to show that the jury's verdict was based on a misunderstanding or confusion as whether the charged offenses constituted "unlawful activity."    Considering the evidence discussed *supra*, the jury's rejection of Hope's self-defense claim was most likely based on their view that Hope armed

himself and renewed his difficulty with Cosmo James and Kurtis Daniels, one to two hours after their last encounter, when he could have avoided it by not returning to the Tree for yet another encounter.  For these reasons, the state court reasonably rejected Hope's claim that counsel was ineffective for failing to seek removal or clarification of the "unlawful activity" language to clarify that the charged offense conduct did not qualify as "unlawful activity."

The state court also reasonably rejected Hope's claim that counsel was ineffective for failing to seek removal or clarification of the "unlawful activity" language to clarify that his possession of a firearm did qualify as "unlawful activity." The only authority cited by Hope's federal habeas counsel for the proposition that the self-defense instructions were erroneous or misleading in circumstances like Hope's are Florida cases decided **after** Hope's trial in 2010, for example, *Andujar-Ruiz v. State*, 205 So. 3d 803, 807 (Fla. 2d DCA 2016), *Dooley v. State*, 268 So. 2d 880 (Fla. 2d DCA 2019), and the numerous cases cited in *Dooley*, all of which were decided in 2013 and later (*see* ECF No. 5 at 23; ECF No. 35 at 4–18).  An attorney's failure to anticipate a change in the law does not constitute ineffective assistance. *See Rambaran v. Sec'y, Dep't of Corr.*, 821 F.3d 1325, 1334 (11th Cir. 2016) (reasonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop) (citing *Spaziano*

*v. Singletary*, 36 F.3d 128, 1039 (11th Cir. 1994)); *see also Jackson v. Herring*, 42 F.3d 1350, 1359 (11th Cir. 1995) ("To be effective within the bounds set by Strickland, an attorney need not anticipate changes in the law.").

Further, both before and after Hope's trial, possession of a firearm by a convicted felon **did** constitute "unlawful activity" for purposes of § 776.013.  *See Dorsey v. State*, 149 So. 3d 144, 146–47 (Fla. 4th DCA 2014); *Hardison v. State*, 138 So. 3d 1130, 1134–35 (Fla. 1st DCA 2014); *Little v. State*, 111 So. 3d 214, 221–22 (Fla. 2d DCA 2013).  And although possession of a firearm by a convicted felon did not preclude a defendant from claiming immunity under 776.012(1), the law on that point was not clarified until **after** Hope's trial.  *See Dorsey*, 149 So. 3d at 146–47; *Garrett v. State*, 148 So. 3d 466, 471 (Fla. 1st DCA 2014); *Hardison*, 138 So. 3d at 1134–35; *Little*, 111 So. 3d at, 221–22.

Hope failed to demonstrate that the state court unreasonably applied *Strickland* in determining that defense counsel's failure to object to the standard jury instructions on self-defense, or seek clarifying instructions, was unreasonable.  Therefore, Hope is not entitled to federal habeas relief on Ground One.

B.    Ground Two:  "Petitioner was denied his Sixth Amendment right under the U.S. Constitution to effective assistance of counsel due to his counsel's failure to call certain material witnesses to testify at trial."

Hope asserts defense counsel was ineffective for failing to present testimony from two material witnesses at trial, Leon Wiggins and Jessie Coleman (ECF No. 5 at 11, 25–28). Hope asserts Leon Wiggins would have testified he saw Kurtis Daniels remove a gun and drugs from Cosmo James' body after Cosmo was shot but before law enforcement arrived (*id.* at 25). Hope contends Wiggins was the only neutral witness who would have corroborated Hope's testimony that Cosmo was armed when Hope shot him (*id.*).

Hope asserts Jessie Coleman would have testified to the following facts: (1) he was the third person in Hope's vehicle at the time of the shooting; (2) Cosmo and Kurtis were threatening Hope with a gun and bottles at the time of the shooting; and (3) Hope impulsively grabbed the gun from his girlfriend's bag and began shooting in self-defense (ECF No. 5 at 25). Hope contends Coleman was an unbiased witness who would have corroborated Hope's testimony that Cosmo was armed with a gun at the time of the shooting (*id.* at 25–26). Hope also contends Coleman's testimony would have shown that his actions were not premeditated and instead were a spontaneous reaction to the acts of Cosmo and Kurtis (*id.*).

Hope asserts he presented this IATC claim to the state courts in his first Rule 3.850 motion and his appeal to the First DCA in Case No. 1D14-1430 (ECF No. 5 at 11–12). He contends the state court's adjudication of the claim was based on an

incorrect determination of the facts and was an unreasonable application of *Strickland* (ECF No. 35 at 18–22).

The State concedes Hope exhausted this claim by presenting it in his first Rule 3.850 motion (ECF No. 17 at 31). The State contends the state courts' adjudication of the claim was not an unreasonable application of *Strickland* (*id.* at 31–35).

1.      Clearly Established Federal Law

The *Strickland* standard governs this claim.

2.      Federal Review of State Court Decision

Hope presented this claim as Ground VI of his first Rule 3.850 motion (Ex. GG at 46–49). The state circuit court adjudicated the claim as follows:

> As to ground [VI], Defendant alleges that trial counsel was ineffective for failing to call certain witnesses to testify at trial. In order to state a facially sufficient claim for failure to call a witness at trial, the movant must allege the following: (1) the identity of the potential witness; (2) the substance of the witness's proposed testimony; (3) an explanation of how the omission of the proposed testimony prejudiced the outcome of the case; and, (4) a representation that the witness was available for trial. *Leftwich v. State*, 954 So. 2d 714, 714 (Fla. 1st DCA 2007) (citing *Nelson v. State*, 875 So. 2d 579, 583–84 (Fla. 2004). Defendant provides this information.
>
> As to potential witness Leon Wiggins, Defendant claims that this witness would have testified to seeing victim Daniels removing a gun and drugs from the person of victim James prior to law enforcement arriving on the scene, which would have corroborated Defendant's testimony that he shot James in self-defense. The record reflects that other defense witnesses testified at trial that the victim had a gun and

threatened Defendant with it.  *See* Trial Transcript at 240 (lines 23–25) – 249 (lines 1–2), 277 (lines 23–25) – 301 (lines 1–8), 313 (lines 13–25) – 320 (lines 1–6), 324 (lines 15–25) – 325 (lines 1–2).  Thus, this testimony would have been cumulative to what had already been presented.  For this reason, it is unlikely that this testimony would have affected the outcome of the trial.

As to potential witness Jesse Coleman, Defendant claims that this witness would have testified that he was in the vehicle with Defendant and his girlfriend Demetria Duncan when the offense occurred. According to Defendant, Coleman would have further testified that victims "James and Daniels were threatening Defendant with a gun and bottles; that Defendant impulsively grabbed the gun from this [sic] girlfriend's bag; and that Defendant shot in self-defense."  The record reflects that other defense witnesses testified at trial that the victim had a gun and threatened Defendant with it.  *See* Trial Transcript at 240 (lines 23–25) – 249 (lines 1–2), 277 (lines 23–25) – 301 (lines 1–8), 313 (lines 13–25) – 320 (lines 1–6), 324 (lines 15– 25) – 325 (lines 1–2).  Thus, this testimony would have been cumulative to what had already been presented.   For this reason, it is unlikely that this testimony would have affected the outcome of the trial.  Furthermore, the remainder of Coleman's proposed testimony is essentially speculation and conjecture.

(Ex. HH at 195–96).  The First DCA affirmed the circuit court's adjudication of this claim (presented as Issue Two in the post-conviction appeal (*see* Ex. II at 15–22)) without written opinion (Ex. PP).

Hope's federal habeas counsel contends the state court's finding that the testimony of Mr. Wiggins and Mr. Coleman would have been cumulative is "wholly unsupported by the record" (*see* ECF No. 35 at 20).  Counsel asserts neither David Lewis nor Dennis Neal testified that Cosmo James had a gun during the fourth and

final encounter between Hope, Cosmo James, and Kurtis Daniels (*id.*). Counsel further asserts Jessie Coleman would have testified Hope impulsively grabbed the gun from his girlfriend's bag and began shooting in response to Cosmo and Kurtis' threatening Hope with a gun and bottles.

Hope has not shown, by clear and convincing evidence, that the state court's factual findings were unreasonable. The trial transcript demonstrates that although Dennis Neal did not **directly** testify he saw Cosmo with a gun during the fourth and final encounter, Mr. Neal admitted he previously provided sworn testimony that he saw Cosmo go to the trunk of his car and "pull[ ] his piece right here again" during the fourth and final encounter (*see* Ex. C at 297–300). And Mr. Neal testified that his memory was better at the time of his prior sworn testimony than at the time of trial (*id.* at 300–01).

Additionally, Ms. Duncan testified that Hope retrieved the gun in response to Kurtis' "trying to throw a bottle" and Cosmo's standing with his hand under his shirt "like he's holding a gun" (Ex. D at 321, 324–25) as she had seen Cosmo do during previous encounters.

Considering this evidence, it cannot be said that the state court's finding, that the potential additional testimony of Leon Wiggins and Jessie Coleman was cumulative, is wholly unreasonable. *See Riechmann v. Fla. Dep't of Corr.*, 940 F.3d

559, 575 (11th Cir. 2019) (state court's finding that potential additional testimony was cumulative was not a wholly unreasonable determination of the facts in light of the evidence presented where the evidence showed that much of the potential testimony was repetitious).  And since the potential evidence was cumulative with respect to the fact that Cosmo armed himself with a gun during the final encounter, the state court did not unreasonably apply *Strickland* in concluding that Hope failed to show he was prejudiced by defense counsel's failure to present it at trial.  *See, e.g., Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1218 (11th Cir. 2007) ("In light of the penalty phase evidence of abuse inflicted by Stewart's biological mother, we agree with the state 3.850 court and Florida Supreme Court that similar evidence of Mr. Scarpo's abuse would not have impacted sentencing or produced a different result.").

Furthermore, Hope's assertion that Jessie Coleman was an "unbiased" witness is refuted by Hope's trial testimony.  Hope described Jessie Coleman (the person in the back seat of Hope's car at the time of the shooting) as "like my brother" and "attached to me, so we still consider each other blood" (Ex. D at 379).  This is hardly the description of an "unbiased" witness.

Hope has not demonstrated that the state court's adjudication of Ground Two was contrary to or an unreasonable application of *Strickland*, or based upon an

unreasonable determination of the facts.  Therefore, Hope is not entitled to federal habeas relief on Ground Two.

> **C.    Ground Three:    "Petitioner was denied due process under the Fourteenth Amendment to the United States [sic] when he was resentenced outside his presence."**

Hope asserts he was originally sentenced on March 26, 2010 to life imprisonment with a 25-year minimum mandatory term on Count I (attempted first-degree murder) (*see* ECF No. 5 at 29).  He states he was resentenced on September 22, 2011, to the same sentence on Count I.  Hope states on March 8, 2013, he filed a motion to correct illegal sentence challenging the mandatory minimum sentences imposed pursuant to Florida's 10/20/Life statute, on the ground that the charging document failed to allege the facts upon which the sentence enhancements were based (*id.*).  Hope states the circuit court granted his motion and directed the clerk of court to amend his sentence without holding a resentencing hearing and outside of the presence of Hope or counsel on his behalf (*id.*).  Hope contends the court's resentencing violated his due process rights under the Fourteenth Amendment (ECF No. 5 at 12, 28–31; ECF No. 35 at 22–26).

Hope asserts he presented Ground Three to the state courts in his Rule 3.800(a) motion and his appeal to the First DCA in Case No. 1D15-1752 (ECF No. 5 at 12).

The State concedes Hope exhausted this claim by presenting it in his motion to correct illegal sentence (ECF No. 17 at 36). The State contends the state courts' adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 36–38).

### 1.    Clearly Established Federal Law

The Due Process Clause grants criminal defendants a "right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987).

### 2.    Federal Review of State Court Decision

Hope presented this claim in his second Rule 3.800(a) motion (Ex. YY at 1–3). The state circuit court adjudicated the claim as follows:

> 1.    On March 26, 2010, Defendant was found guilty after a jury trial of Attempted First-Degree Murder (count I); Aggravated Battery with a Deadly Weapon (count II); and Aggravated Assault with a Deadly Weapon (counts III, IV and V). *See Verdict*. The court subsequently sentenced Defendant, on count I, to life imprisonment in the Department of Corrections with a mandatory minimum of 25 years pursuant to section 775.087(2), Florida Statutes; on count II, to a mandatory minimum 25 years pursuant to section 775.087(2); on counts III, IV, and V, to a mandatory minimum 20 years pursuant to section 775.087(2), concurrent with the sentence on count I. Defendant filed an appeal. On August 23, 2011, the First District Court of Appeal, in a written opinion, affirmed the convictions on counts l, III, IV, and V; but reversed the conviction and sentence on count II and directed

that that count be dismissed and that Defendant be resentenced.  *Hope v. State*, 68 So. 3d 366 (Fla. 1st DCA 2011).

On September 22, 2011, the court resentenced sentenced [sic] Defendant, on count I, to life imprisonment in the Department of Corrections with a mandatory minimum of 25 years pursuant to section 775.087(2), Florida Statutes; and, on counts III, IV, and V, to a mandatory minimum 20 years pursuant to section 775.087(2), concurrent with the sentence on count I.  Defendant filed an appeal.  On January 31, 2013, the First District Court of Appeal affirmed the sentences in a written opinion.  *Hope v. State*, 134 So. 3d 1044 (Fla. 1st DCA 2013).

On March 8, 2013, Defendant filed a motion to correct illegal sentence.  This Court granted that motion and amended the mandatory minimum on count I to 20 years imprisonment; and amended the sentence on counts III, IV, and V to 3 years imprisonment with a mandatory minimum of 3 years.  *See* Judgment; Amended Sentence.

2.     In the instant motion, Defendant alleges that his amended sentences are illegal because he was not present when the court corrected the mandatory minimums on March 8, 2013.  Defendant moves the Court to vacate his sentences and direct a resentencing at which he is present.

3.     The correction of Defendant's mandatory minimums was a ministerial act which did not require Defendant's presence.  *See Jordan v. State*, 143 So. 3d 335, 339 (Fla. 2014), *reh'g denied* (July 9, 2014) ("[R]esentencing a defendant in his absence will be harmless where it involves only a ministerial act.").  However, if it was error for failing to have Defendant present, the record reflects that at his resentencing on September 22, 2011, the court re-imposed a life sentence on count I.  *See* Resentencing (09/22/2011) Transcript at 11 (lines 11–25) – 12 (lines 1–11).  The lowering of the mandatory minimum on count I from 25 years to 20 years would not have affected the total sentence of life imprisonment on that count.  And, as to counts

Ill, IV, and V, those sentences have been reduced to the mandatory minimum of 3 years. *See* Amended Sentence. Thus, the court does not have any discretion to reduce the sentences on those counts any further. Accordingly, the claim raised is without merit.

(Ex. YY at 4–6).

On appeal to the First DCA, the State conceded that the trial court's resentencing Hope in his absence constituted error under *Jordan v. State*, 143 So. 3d 335 (Fla. 2014), but the State argued the error was harmless, because it was evident that the trial court intended to sentence Hope to the maximum allowable punishment (*see* Ex. AA). The First DCA affirmed the circuit court's decision without written opinion (Ex. CCC).

The Eleventh Circuit recently applied *Stincer*'s holding to the circumstances presented here, i.e., resentencing. *See United States v. Thomason*, 940 F.3d 1166, 1171 (11th Cir. 2019). The Eleventh Circuit provided the following framework for determining if a sentence correction is a "critical stage" which constitutionally mandates the defendant's presence:

> One "critical stage" is when the defendant's sentence is imposed, which "extends to the imposition of a[n entirely] new sentenc[e]" following vacatur of the previous sentence. *United States v. Jackson*, 923 F.2d 1494, 1496 (11th Cir. 1991); *see also* Fed. R. Crim. P. 43(a)(3) ("[T]he defendant must be present at . . . sentencing."). The defendant's presence at the sentencing hearing "ensure[s] that . . . [he] has an opportunity to challenge the accuracy of information the sentencing judge may rely on, to argue about its reliability and the weight the

information should be given, and to present any evidence in mitigation he may have." *Jackson*, 923 F.2d at 1496–97.

A defendant does not have "a right to be present whenever" a district court takes an action to modify his sentence. *See United States v. Parrish*, 427 F.3d 1345, 1347 (11th Cir. 2005) (quoting *Jackson*, 923 F.2d at 1496). . . . . [T]he defendant has a right to be present only if the modification to the sentence constitutes a critical stage where "his presence would contribute to the fairness of the procedure." *Stincer*, 482 U.S. at 745, 107 S. Ct. 2658, and many minor modifications to sentences do not satisfy this that requirement. *See Jackson*, 923 F.2d at 1496–97) (holding that the defendant did not have a right to a hearing before a correction under Rule 35 because unlike "an initial sentencing, or even a resentencing where an entire sentencing package has been vacated on appeal," in a correction under Rule 35, the "necessary process has already occurred")).

To determine if a sentence correction is a critical stage requiring a hearing with the defendant present, we have identified two fact-intensive inquiries "to guide our consideration." [*United States v.*] *Brown*, 879 F.3d [1231,] 1239–40 [11th Cir. 2018]. First, we ask whether "the errors [that required] the grant of habeas relief undermine[d] the sentence as a whole." *Id.* at 1239. Second, we ask whether "the sentencing court exercise[d] significant discretion in modifying the defendant's sentence, perhaps on questions the court was not called upon to consider at the original sentencing." *Id.* at 1239–40. If these factors are present, the district court may not modify the defendant's sentence without holding a hearing with the defendant present. *Id.* at 1240.

An error undermines the sentence as a whole when it forces the district court to revisit the entire sentence. This kind of error occurred in *Brown* when the movant's sentence on a single count had been erroneously enhanced under the Armed Career Criminal Act—for an increased statutory and guideline range. *Id.* at 1240. There may also be times when a hearing is required even if only one count in a multi-count conviction is unlawful. *Id.* at 1239. But when the district court

vacates a single count in a multi-count conviction, it has the discretion to determine whether it needs to conduct a full resentencing to ensure that the sentence remains "sufficient, but not greater than necessary, to comply with the purposes [of sentencing in section 3553(a)]." 18 U.S.C. § 3553(a); *Jackson*, 923 F.2d at 1496–97; *Troiano v. United States*, 918 F.3d 1082, 1087 (9th Cir. 2019) ("[T]he decision . . . to conduct a full resentencing on all remaining counts of conviction when [the district court modifies] one or more counts of a multi-count conviction . . . rests within the sound discretion of the district court."), *cert. denied*, — U.S. —, 139 S. Ct. 2729, — L. Ed. 2d — (2019); *United States v. Hadden*, 475 F.3d 652, 669 (4th Cir. 2007).

A district court need not conduct a full resentencing when correcting the error does not change the guideline range and the district court does not make the sentence more onerous. *See Brown*, 879 F.3d at 1239–40. In *Jackson*, for example, we held that the district court was not required to hold a hearing before correcting the defendant's sentence, Fed. R. Crim. P. 35, after concluding that the sentences for some of the counts were too long and lowering the sentences for those counts. 923 F.2d at 1495–97. And in *Troiano*, the Ninth Circuit held that the district court did not abuse its discretion in refusing to hold a hearing before reducing the movant's sentence on one count in a four-count conviction when correcting the error did not change the movant's guideline range or his total sentence. 918 F.3d at 1084–88; *see also Hadden*, 475 F.3d at 669 (holding that the district court did not err in refusing to hold a hearing before vacating one count of a three-count conviction and reducing the total sentence by the term of imprisonment for that count).

A resentencing hearing may be necessary "when a court must exercise its discretion in modifying a sentence in ways it was not called upon to do at the initial sentencing." *Brown*, 879 F.3d at 1239. That exercise may occur, for example, if the district court vacates a mandatory-minimum sentence and then is able to consider the statutory sentencing factors for the first time. *Id.* . . . . Again, the touchstone is whether the district court exercised its discretion so significantly that

the modification is a critical stage where the defendant's presence could make a difference.  *See id.*

*Thomason*, 940 F.3d at 1171–73.  In *Thomason*, the Eleventh Circuit concluded that the district court's resentencing the defendant outside his presence did not violate due process.  This conclusion was based upon the fact that the error which precipitated the resentencing did not affect Thomason's guidelines range, and the court resentenced him to a less onerous total sentence.  940 F.3d at 1174.

That is similar to what happened in Hope's case.  The error which precipitated the entry of amended sentences in 2013 did not undermine Hope's sentence as a whole.  It did not change Hope's lowest permissible sentence under the sentencing guidelines.  And it did not change the reclassification of Count I from a first-degree felony to a life felony, pursuant to § 775.087(1).  Further, the court's reducing the mandatory minimum terms under the 10/20/Life statute, § 775.087(2), did not require the court to exercise its discretion in modifying Hope's sentence in ways it was not called upon to do at the original sentencing or the 2011 resentencing.[7] Although the court certainly had discretion to modify Hope's total life sentence in 2013, it did not do so, and modified only the 20-year sentences on Counts III, IV,

---

[7] Hope and his counsel appeared at both the original sentencing and Hope's resentencing in 2011(*see* Ex. P at 528–48, Ex. S at 1–13).  At both hearings, they asked the court exercise mercy by not imposing a total life sentence (*see id.*).

and V to 3-year sentences.  The court also corrected the length of the mandatory minimum sentences on all Counts.

Hope has not demonstrated that the state court's adjudication of Ground Three was contrary to or an unreasonable application of *Stincer* or the holding of any other decision of the United States Supreme Court.  *See Wood*, 575 U.S. at 316 (clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings decisions of the United States Supreme Court).  Nor has Hope shown that the state court's adjudication was based upon an unreasonable determination of the facts. Therefore, he is not entitled to federal habeas relief on Ground Three.

> D.   Ground Four:  "Newly discovered evidence warranted a new trial due to primary witness recanting his testimony and admitting to lying at trial."

Hope asserts that in 2016, six years after his trial, he encountered Virgil Greenlee at Madison Correctional Institution (ECF No. 5 at 12–13).  Hope asserts Mr. Greenlee told him that Kurtis Daniels admitted to him that he left the scene of the shooting with a BB gun before law enforcement arrived.  Hope asserts Greenlee also told him that Kurtis Daniels admitted he lied at Hope's trial (*id.* at 31–32).  Hope contends this new evidence would likely have swayed the jury in his favor such that they would have found he acted in self-defense (which would have resulted in an acquittal) (ECF No. 5 at 32–33; ECF No. 35 at 27–28).  Hope asserts he presented

his claim of newly discovered evidence to the state courts in his fourth Rule 3.850 motion and his appeal to the First DCA in Case No. 1D17-1907 (ECF No. 5 at 13).

The State concedes Hope exhausted this claim in the state courts (ECF No. 17 at 40). The State contends the state court's adjudication of the claim was not contrary to or in violation of federal constitutional law (*id.* at 39–43).

The reasonableness of the state court's decision matters only if Hope's substantive claim is cognizable on federal habeas review. It is not. Hope's substantive claim is that Kurtis Daniels' admissions to Victor Greenlee (that he removed a BB gun from the scene and lied at Hope's trial) shows Hope is innocent. But a freestanding claim of actual innocence based upon newly discovered evidence is not cognizable on federal habeas review. *See Herrera v. Collins*, 506 U.S. 390, 400, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."); *Townsend v. Sain*, 372 U.S. 293, 317, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963) ("[T]he existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus."), *overruled on other grounds*, 504 U.S. 1 (1992); *see also Cunningham v. Dist. Attorney's Office for Escambia Cnty.,* 592 F.3d 1237, 1272

(11th Cir. 2010) ("[T]his Court's own precedent does not allow habeas relief on a freestanding innocence claim in non-capital cases[.]"); *Jordan v. Sec'y, Dep't of Corr.*, 485 F.3d 1351, 1356 (11th Cir. 2007) (explaining, after declining to consider freestanding claim of actual innocence because it did not fall within certificate of appealability order, "our precedent forbids granting habeas relief based upon a claim of actual innocence, anyway, at least in non-capital cases"); *Brownlee v. Haley*, 306 F.3d 1043, 1065 (11th Cir. 2002) (citing *Herrera*) ("It is not our role to make an independent determination of a petitioner's guilt or innocence based on evidence that has emerged since the trial."); *Swindle v. Davis*, 846 F.2d 706, 707 (11th Cir. 1988) ("Newly discovered evidence which goes only to the guilt or innocence of the petitioner is not sufficient to require habeas relief.").

The prohibition on freestanding claims of actual innocence in a habeas petition respects the nature of our federal system:  "Federal courts are not forums in which to relitigate state trials."  *Herrera*, 506 U.S. at 401 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887, 103 S. Ct. 3383, 77 L. Ed. 2d 1090 (1983)).  When reviewing a habeas petition, federal courts "sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." *Id.* at 400. And "[f]ew rulings would be more disruptive of our federal system than to provide for federal habeas review of freestanding claims of actual innocence." *Id.* at 401.

To be sure, a prisoner may assert actual innocence to overcome a procedural

bar that would otherwise prevent a federal court from hearing his claim on the merits.

*See Sawyer v. Whitley*, 505 U.S. 333, 338–39, 112 S. Ct. 2514, 120 L. Ed. 2d 269

(1992); *see also Herrera*, 506 U.S. at 404. But Hope does not raise his "newly

discovered evidence" claim in order to overcome a procedural bar. Since the

existence of newly discovered evidence relevant to the guilt of a state prisoner is not

a ground for federal habeas relief, Hope is not entitled to relief on Ground Four.

> E.    Ground Five: "Petitioner was denied his Sixth and Fourteenth
> Amendment rights in that the trial court sentenced him to life on Count I when
> the court failed to orally pronounce Petitioner was being sentenced under
> Florida's 10/20/Life statute at Petitioner's resentencing on September 22,
> 2011 or his resentencing on May 20, 2013, and thus, the maximum sentence
> Petitioner could receive was 30 years."

Hope asserts at his original sentencing on March 26, 2010, the court sentenced

him to an enhanced sentence under Florida Statutes § 775.087, which included (1)

reclassifying count I from a first-degree felony to a life felony pursuant to

§ 775.087(1), and (2) imposing mandatory minimum terms pursuant to the

10/20/Life provisions of § 775.087(2) (ECF No. 5 at 13, 33–35; ECF No. 35 at 29–

32). Hope asserts at his first resentencing on September 22, 2011, the court

sentenced him to life in prison with a 25-year mandatory minimum on Count I, but

the court never orally referenced any sentencing enhancement statute (*id.*). Hope

asserts that without an oral pronouncement that the court was imposing sentence under § 775.087, the court essentially imposed a life sentence for a first-degree felony, which exceeds the 30-year statutory maximum set forth in § 775.082(b)1. (*id.*).  Hope asserts the written judgment cited the enhancement statute, § 775.087, but it did not conform to the oral pronouncement because the court did not orally pronounce the statute (*id.*).

Hope contends the state court denied his Fourteenth Amendment right to due process and his Fifth Amendment right against double jeopardy at the 2011 resentencing by failing to conform the written judgment to the oral pronouncement (ECF No. 5 at 35; ECF No. 35 at 31).  He asserts he presented Ground Five to the state courts in a Rule 3.800 motion and his appeal to the First DCA in Case No. 1D17-1680 (ECF No. 5 at 13–14).

The State concedes Hope exhausted this claim by presenting it in a motion to correct illegal sentence (ECF No. 17 at 43–44).  The State contends the state courts' adjudication of the claim was not contrary to or in violation of federal constitutional law (*id.* at 44–45).

### 1.    Clearly Established Federal Law

The Double Jeopardy Clause of the Fifth Amendment, which applies to the states through the Fourteenth Amendment, protects against multiple punishments for

the same offense. *See Justices Boston Mun. Court v. Lydon*, 46 U.S. 294, 306, 104 S. Ct. 1805, 80 L. Ed. 2d 311 (1984); *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969).  This protection is "designed to ensure that the sentencing discretion of the courts is confined to the limits established by the legislature." *Ohio v. Johnson*, 467 U.S. 493, 499, 104 S. Ct. 2536, 81 L. Ed. 2d 425 (1984); *see also Ex Parte Lange*, 18 Wall. 163, 21 L. Ed 872 (1874) (a defendant may not receive a greater sentence than the legislature has authorized).

> 2.      Federal Review of State Court Decision

Hope presented this claim as Issue A(c) in the supplement to his third Rule 3.800 motion filed on December 12, 2016 (Ex. SSS at 37–40, 43–45).  The state circuit court adjudicated the claim as follows:

> 1.      On March 26, 2010, Defendant was found guilty after a jury trial of Attempted First-Degree Murder (count I); Aggravated Battery with a Deadly Weapon (count II); and, Aggravated Assault with a Deadly Weapon (counts III, IV and V).  *See* Verdict.  The court subsequently sentenced Defendant, on count I, to life imprisonment in the Department of Corrections with a mandatory minimum of 25 years pursuant to section 775.087(2), Florida Statutes; on Count II to a mandatory minimum 25 years pursuant to section 775.087(2); on counts III, IV, and V to a mandatory minimum 20 years pursuant to section 775.087(2), concurrent with the sentence on count I.  Defendant filed an appeal.  On August 23, 2011, the First District Court of Appeal, in a written opinion, affirmed the convictions on counts I, III, IV, and V; but reversed the conviction and sentence on count II and directed that that count be dismissed and that Defendant be resentenced.  *Hope v. State*, 68 So.3d 366 (Fla. 1st DCA 2011).

On September 22, 2011, the court resentenced Defendant, on count I, to life imprisonment in the Department of Corrections with a mandatory minimum of 25 years pursuant to section 775.087(2), Florida Statutes; and on counts III, IV, and V, to a mandatory minimum 20 years pursuant to section 775.087(2), concurrent with the sentence on count I. Defendant filed an appeal. On January 31, 2013, the First District Court of Appeal affirmed the sentences in a written opinion. *Hope v. State*, 134 So. 3d 1044 (Fla. 1st DCA 2013).

On March 8, 2013, Defendant filed a motion to correct illegal sentence. This Court granted that motion and amended the mandatory minimum on count I to 20 years imprisonment; and amended the sentence on counts III, IV, and V to 3 years imprisonment with a mandatory minimum of 3 years. *See* Judgment; Amended Sentence.
. . . .

5.    As to Ground (C), Defendant argues that his amended sentence as to Count I is illegal because the sentencing court did not orally pronounce that he was being sentenced pursuant to 10-20-Life (§ 775.087), Fla. Stat. (2009). Defendant moves the Court to vacate his amended sentence and direct a resentencing.

"Generally, courts have held that a written order must conform to the oral pronouncement . . . because the written sentence is usually just a record of the actual sentence required to be pronounced in open court." *Justice v. State*, 674 So. 2d 123, 125 (Fla. 1996). Defendant relies on the Florida Supreme Court's holding in *State v. Akins*, 69 So. 3d 261 (Fla. 2011) to support his argument that a failure to orally pronounce a sentencing enhancement, followed by a subsequent modification of the written judgment and sentence to reflect the omitted enhancement, constitutes an illegal sentence and violation of double jeopardy. The Court finds the facts of *Akins* to be distinguishable from the instant case. In *Akins*, "Akins' sentence was made more onerous after he began serving it". *State v. Akins*, 69 So. 3d at 271. However, the facts of the instant case are more analogous to those in *Mann v. State*, 851 So. 2d 901 (Fla. 3d DCA 2003), in which the Third District

Court of Appeal held that double jeopardy was not offended when the trial court misspoke during sentencing as to the name of the applicable enhancement because the length of the sentence was not increased after it was imposed.

Similarly, at the resentencing hearing on September 22, 2011, Defendant was orally sentenced to life imprisonment with a minimum mandatory of 25 years.[FN 1:  As previously noted, the minimum mandatory for Count I was later reduced from 25 years to 20 years in an amended sentence.]  *See* Resentencing Hearing Transcript at 11 (lines 14–25) – 12 (1–11).  Regardless whether the sentencing court used the specific phrases "10-20-Life" or "§ 775.087, Florida Statutes" during the resentencing, its oral pronouncement as to the length of the sentence was clear and unchanged when reduced to writing. Accordingly, the claim raised is without merit.

(Ex. SSS at 51–53).  The First DCA affirmed the circuit court's decision without written opinion (Ex. VVV).

Hope's federal counsel does not cite any Supreme Court decision which held that a trial court violates either the Due Process Clause or the Double Jeopardy Clause by resentencing a defendant pursuant to the same enhancements as the original sentence but without orally referencing the enhancement statute.  The only federal cases counsel cites are a Ninth Circuit case, *United States v. Juan Munoz-De Law Rosa*, 495 F.2d 253 (9th Cir. 1974) and an unpublished Eleventh Circuit case, *Johnson v. Sec'y, Dep't of Corr.*, 717 F. App'x 896, 898 (11th Cir. 2017) (*see* ECF

No. 5 at 34–35; ECF No. 35 at 29–32).  Neither of those decisions is controlling authority, let alone "clearly established federal law" for purposes of § 2254.[8]

The purpose of the 2011 resentencing was strictly to reflect the dismissal of the aggravated battery charge in Count II as instructed by the First DCA in Hope's direct appeal.  *See Hope v. State*, 68 So. 3d 336 (Fla. 1st DCA 2011) (Mem) ("We affirm the first two issues raised by Appellant without comment, and based on the State's concession of error on the third issue, **we remand for resentencing to reflect the dismissal of the aggravated battery charge**." (emphasis added)).  That is what the court did at the 2011 resentencing.  Although the court also considered Hope's request that the court exercise mercy by modifying his life sentence on Count I,

---

[8] In *Munoz-Dela Rosa*, the Ninth Circuit held, "In cases where there is a direct conflict between an unambiguous oral pronouncement of sentence and the written judgment and commitment, this Court has uniformly held that the oral pronouncement, as correctly reported, must control.  The only sentence that is legally cognizable is the actual oral pronouncement in the presence of the defendant."  495 F.2d at 256.

Hope's counsel cites *Johnson* for the proposition that a state court denies a petitioner's right to due process under the Fourteenth Amendment when it fails to conform the written judgment to the oral pronouncement (*see* ECF No. 35 at 31).  *Johnson* stands for no such proposition.  Indeed, *Johnson* did not even address a Fourteenth Amendment claim.  Instead, the Eleventh Circuit considered whether a state court's subsequent striking of a "retention-of-jurisdiction" provision from a written judgment as a clerical error resulted in a new judgment for purposes of determining whether a federal habeas challenge was a second or successive federal challenge to a state court judgment.  717 F. App'x 898.  In determining that the state court did not issue a "new judgment," the Eleventh Circuit cited a Florida state case for the proposition that when the written sentencing order is inconsistent with the oral sentencing pronouncement, the oral pronouncement controls.  *Id.* (citing *State v. Jones*, 753 So. 2d 1276, 1277 n.2 (Fla. 2000)).

based upon circumstances presented by Hope and his father and argued by Hope's

counsel at the resentencing hearing, the court rejected Hope's request for

modification and imposed the same sentences as originally imposed:

> THE COURT: I was the trial judge in this case, so I sat through the trial and I heard the evidence, and I know what the case is about.
>
> There are some things we get ourselves into that are really difficult to extricate ourselves from. Mr. Hope, I'm going to resentence you on Count I, attempted first-degree murder. That will be a sentence of your natural life with a minimum mandatory 25 years. Credit 331 days county time served prior to that. DOC directed to calculate the state time.
>
> Count II is being eliminated by the Appellate Court and by the action of the State Attorney's Office. And I do intend to—that is a minimum—that is a minimum mandatory of 25 on Count I.
>
> On Count III, IV and V, each of those are also sentenced as 25 years in the Department of Corrections with a minimum mandatory 20 years on each one of those counts, which is the same at 20 years—I'm sorry. 20 years on Count III. Count II is gone. 20 years on Count III, which is a minimum mandatory. 20 years on Count IV, which is a minimum mandatory. And 20 years on Count V, which is a minimum mandatory. Credit for all counts; all served concurrently. The credit is 331 days. DOC to calculate the state time. Fingerprinting, DNA, adjudication. All costs to a judgment as previously done. Those will again be reduced to a judgment.

(Ex. S at 11–12).

The written judgment was entirely consistent with the oral sentencing

pronouncement; it simply identified the statute under which the enhanced sentences

were imposed (*see* Ex. GG at 18–29).  The fact that the resentencing court did not

orally reference the enhancement statute does not suggest the court did not reimpose

enhanced sentences pursuant to the same enhancement statute under which the

original enhancements were imposed, Florida Statutes § 775.087.   Indeed, in the

First DCA's decision in the direct appeal from the 2011 resentencing, the First DCA

recognized that the trial court resentenced Hope under the enhancement statute:

> On remand, Appellant was sentenced to life in prison with a
> mandatory minimum of 25 years on count l, and 20 years concurrent
> with 20-year mandatory minimums on counts 3, 4, and 5.   The
> mandatory minimums were imposed under the 10/20/life statute based
> on the jury's findings that Appellant discharged a firearm causing great
> bodily harm during the commission of count l and that he discharged a
> firearm during the commission of counts 3, 4, and 5.

(Ex. Y).  *Hope v. State*, 134 So. 3d 1044 (Fla. 1st DCA 2013) (footnote omitted).

Hope's federal counsel does not argue that Hope did not qualify for a life

sentence under § 775.087(1); indeed, counsel admits the resentencing court had

discretion to reimpose it (*see* ECF No. 35 at 25–26).  Counsel simply argues that by

failing to orally reference § 775.087 during the 2011 resentencing hearing, the court

"essentially imposed a life sentence for a first-degree felony," which exceeded the

statutory maximum for an unenhanced first-degree felony under § 775.082 (*see id.* at 30).[9]

Hope's life sentence was a valid punishment, under § 775.087, for an offender convicted of attempted first-degree murder who discharged a firearm during commission of the offense. *See* Fla. Stat. 775.087(1)(a). Because Hope did not receive a greater sentence than the Florida Legislature authorized, he has not demonstrated that the state court's adjudication of Ground Five was contrary to or an unreasonable application of "clearly established federal law" within the meaning of § 2254. Hope is not entitled to federal habeas relief on Ground Five.

## IV. CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of

---

[9] Without any enhancement or reclassification, first degree murder is a capital felony, punishable by life imprisonment without eligibility for parole. *See* Fla. Stat. § 782.04(1)(a); § 775.082(1)(a). **Attempted** first degree murder, which is what Hope was found guilty of in Count I, is a first-degree felony, *see* Fla. Stat. § 777.04(4)(b), punishable by a term of imprisonment not exceeding 30 years "or, when specifically provided by statute, by imprisonment for a term of years not exceeding life imprisonment." Fla. Stat. § 775.082(3)(b).1. Section 775.087(1)(a) allowed attempted first-degree murder to be reclassified as a life felony because Hope discharged a firearm during commission of the offense. *See Moss v. State*, 270 So. 3d 559, 560 (Fla. 1st DCA 2019).

In 2013, the trial court recognized Hope was subject to only a 20-year mandatory minimum on Count I and a 3-year mandatory minimum on Counts III, IV, and V, under § 775.087, and entered an order directing the clerk of court to enter an amended judgment, without a hearing, to so reflect (*see* Ex. GG at 6–10, 78–86).

appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"  *Buck v. Davis*, 580 U.S.—, 137 S. Ct. 759, 773, 197 L. Ed. 2d 1 (2017) (citing *Miller-El*, 537 U.S. at 327).  The petitioner here cannot make that showing.  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that

party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That the amended petition for writ of habeas corpus (ECF No. 5) be **DENIED**.

2.    That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 13<u>th</u> day of March 2020.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**